May 10. The Judges delivered their opinions.
JUDGE CARR.
This is a case arising on our Law of Descents, and involving a most important principle of construction. Anthony Gardner had a brother who had one daughter, (Mrs. Davis,) anda sister who had two sons, James and Francis Rowe, and two daughters, Mrs. Boyd and Mrs. Shackleford. The sister and brother of Anthony Gardner died before him, leaving these children. Mrs. Boyd and Mrs. Shackleford, also died in his life-time; the first leaving two children, the last six; and then Anthony Gardner died intestate and without issue, leaving estate real and personal. The question is, how shall this- estate be divided between these eleven relations? For the Plaintiff, (Mrs. Davis,) it is contended, that our Statute has no provision by which we can adjust the proportions of the claimants, that we must therefore call in the aid of the Common Law, and by the jus representations, placing Mrs D. in the shoes of her father, give her half the estate, and divide the other moiety among the rest. For the Defendants it is contended, that the Common Law has been utterly abolished *717 by the Statute, and can in no question of descents be invoked; that the Statute embraces this case, and under it the inheritance should be divided into five portions, one of which should be given to each of the nephews, one to the niece, and the other two to be divided between the descendants of Mrs. Boyd and Mrs. Shackle-ford. The Chancellor decreed to this effect, from which the appeal is taken. Perhaps a few preliminary remarks may enable us the better to understand the force, effect and extent of our Statute. *irrom the date of our existence as a Colony, to the Revolution, the Common Law, regulating the descent of real estates, was the Law of the land. Of this Law the first Canon, as noticed by Blackstone, is, that inheritances shall lineally descend to the issue of the person who last died actually seised, in infinitum, but shall never lineally ascend : 2dly. That the male issue shall be admitted before the female: 3dly. That where there are two or more males in equal degree, the eldest only, shall inherit but the females all together: 4th. That the lineal descendants, in infinitum of any person deceased, shall represent their ancestor, that is, shall stand in the same place as the person himself would have done had he been living: Sth. That on failure of- the lineal descendants or is-

*718 sue, of the person last seised, the inheritance shall descend to his collateral relations, being of the blood of the first purchaser: 6th. This collateral heir must be the next collateral kinsman of the Whole blood. Every body knows that these Canons of descent are the creatures of the Feudal System, and, however calculated to support a Government like that of England, are in violation of natural affection, and repugnant to the free spirit of a republic. While the descent of real estate was thus carefully moulded by the Common Eaw, according to the spirit of the Feudal System, it took no thought of the personalty; but left it to the control of a different system ; for, where no Will appeared, the Ordinary had the absolute disposal of the personal estate; being not bound (further than in conscience,) to pay the debts of the intestate. The Statute of Westminster 2, ch. 19, 13th Edw. 1st, subjected the Ordinary to the suit of creditors, as Executors were. By 31st Edw. 3d, they were bound to grant Administration to the nearest and most lawful friends of the deceased : and this is the origin of Administrators, who were placed, by this Statute, on the footing of Executors. Still the Ecclesiastical Courts exercised jurisdiction over the subject. They granted *Administration, they called the Administrators to account, and undertook to distribute the surplus of the personal estate, among the kindred of the intestate, according to the rules of the Civil Eaw, de successoribus, ab intestato. And this was deemed so reasonable, that it was tolerated for a long time, and the Ordinaries, in the bonds taken of the Administrators to account with them, usually inserted a clause, that the overplus upon such account, should be distributed as the Ordinary should appoint.
This matter was at length brought before the Eaw Courts, and they decided that the bonds of the Administrator were of no avail and he not compellable to make distribution at all. And as often afterwards as the Ecclesiastical Courts attempted to compel a distribution, a prohibition was granted. In this state of things, the Statute of 22d and 23d Car. 2, commonly called the Statute of Distributions, was passed, at the instance of the Civilians. It is laid down in many cases, that the reason of passing this Eaw, was to end the contention between the Common Eaw and Ecclesiastical Courts: that its main scope was to enlarge the jurisdiction of the latter; that it was borrowed from the Civil Eaw, and to be construed according to the rules of that Code. The provisions of this Eaw stand in striking contrast with the Canons of Descent of the Common Eaw. Primogeniture, the preference of males over females, the blood of the first purchaser, the rule that property never ascends, the exclusion of the half blood; all these fundamental rules of the Common Law are violated by the Statute of Distributions, Its great object was equality. In Edwards v. Freeman, 2 P. Wms. 441, Sir J. Jekyl, M. R., says, “The Act intended to make the . hil-drens’ provision equal, which was agreeable to the Civil Law, where goods movable, and immovable, (i. e. lands,) are considered as the same.” In tne same case, Eord Raymond says, “The Satute of Distributions does not break into any settlement that has been made by the father; it only meddles with what is left undisposed of by him, *and of that only, makes such a Will for the intestate, as a father, free from the partiality of affections, would himself make; and this I may call a Parliamentary Will. The intention of making the provisions of the children equal, goes through the whole Act.” This Statute was incorporated into our Colonial Code in 1705, (3 H. St. E. 371;) continued in the Revisal of 1748, (5 H. St. E. 444;) and remained in full force until the Eaws of the Revision of 1785, went into effect. At the epoch of our Revolution, then, we had these two systems in operation. The Common Eaw Canons of Descent, founded on the Feudal System, disregarding natural affection and natural justice, and the Statute of Distributions, borrowed from the Civil Eaw, pursuing the presumed Will of the intestate, and well suited by its equality of partition, to the genius of our infant Government. Among the first cares of this Commonwealth, after the close of the war, was the framing of a body of Eaws better suited to our actual situation, than those which had governed us, as part of a Monarchy. For this important work, were selected several citizens, considered most profoundly learned in the science of Eaw. Our Statute of Descents is a part of the fruits of their labors. It has hitherto been admired as a model of consciseness and perspicuity; and so well has it answered its end, that this (I think) is the first serious contest, which has arisen in a period of forty years, on a provision of the Eaw, which came from the hands of the Revisors. (The case of Brown v. Turberville, hereafter to be noticed, arose on an addition made by a subsequent Eegislature.) Eet us now look to the provisions of this Law. Section 1st. When any person, having title to any real estate of inheritance, shall die intestate, as to such estate, it shall descend and pass in parcenary to his kindred, male and female, in the following course. 2d. To ,is children, or their descendants, if there be. If none, then, 3d. To his father. 4th. To his mother, brothers and sisters, and the descendants, or such of them as there be. If none of these, then, 5th. *The inheritance to be divided into two moieties ; one of which shall go to the paternal, the other to the maternal kindred, in the following course. 6th. To the grandfather. If none, 7th. To the grand-mother, uncles and aunts, on the same side, and their descendants, or such of them as there be. 8th. If none, then to the great grandfathers, or great grand-father, if there be but one. 9th. If none, then to the great grand-mothers, or great grand-mother, if but one; and the brothers and sisters of the grand-fathers and grand-mothers, and their descendants, or such of them as there be. And so on, in other cases without end. Section 16. ‘ ‘And where the children of the intestate, or his mother, brothers and sisters, or his grand-mother, uncles and *719 aunts, or any of his female lineal ancestors living, with the children of his deceased lineal ancestors, male and female, in the same degree come into partition, they shall take per capita; that is to say, by persons ; and where, a part of them being dead and a part living, the issue of those dead have right to partition, such issue shall take per stirpes, or by stocks; that is to say, the share of their deceased pai ent. ”
Let us enquire, 1st. Whether this Act did not intend to abolish, and has not in fact abolished, the whole of the Common Daw regulating Descents? 2d. Whether our Act has not for its basis the Statute of Distributions and the Civil Daw? As to the first: It seems to me, that no one can read our Statute, without being struck at once, with the direct and diametrical opposition, in which all its enactments stand to the Canons of the Common Law. The very first rule, “that estates shall descend and pass in parcenary to the kindred, male and female, of the intestate,” destroys, at a single blow, there favorite and cherished principles of the Common Law; primogeniture, sole seisin, and the preference of males. In defect of children, and their descendants, we give the estate to the father. By the Common Law, it would sooner escheat, than ascend lineally. We pay no respect to the blood of the first *purchaser, (except in the case of infants, and that by a Law after 1785.) At Common Law, land would escheat sooner than descend to any however near of kin, if not of the blood of the first purchaser. We give collaterals of the half blood, half portions. The Common Law excludes xhem wholly. With us, bastards may inherit and transmit inheritance, on the part of the mother. At Common Law, they are utterly incapable of inheritance. We say, that wnere there is no kindred, paternal or maternal, the inheritance shall go to the wife or husband of the intestate. At Common Law, husband or wife can never inherit from each other. Do not these instances prove, that the framers of our Law, looked at the Common Law Canons of Descent to avoid, not to imitate? To pull down, not to build up? All its principles are violated: its land marks removed; its fences broken down; its traces obliterated. While these marks of reprobation would seem, (even if our Act were confessedly defective,) to forbid our resorting to this exploded system to supply the defect, such resort is entirely unnecessary; for, I insist that our Act isa complete and perfect whole, containing within itself a provision for every case that can arise. As to the persons or classes of persons that are to inherit, it is acknowledged, that the Act is so clear and comprehensive, as to render improper a reference to any other system. And to my apprehension, it seems to be equally comprehensive as to the proportions, in which the persons or classes designated, are to take. As to this last, this Act lays down two rules ; within one or other of which, every case must fall. They are contained in the first and sixteenth sections. 1st. The estate shall descend to the kindred, male and female of the intestate, in par-cenary; that is, in equal shares. The clear effect of this is, tl at wherever a class is called to the inheritance together, they take equally, male and female. Thus, “to his children, or their descendants, in equal shares. To his mother, brothers and sisters, and their descendants, in equal shares. To his ’‘grand-mother, uncles and aunts, and their descendants, in equal shares;” and so on, in the grades more remote. Thus is one great principle of the Act (equality) established. But, there is another feature equally striking throughout this excellant Statute. It is founded on the affections of the heart: It follows the current in its natural flow, presuming that those that are nearest in blood, are nearest in affection. Thus, it is first to his children, or their descendants, next to his father, then to his mother, brothers and sisters, &c., always exhausting the nearer class before it passes to the more remote. But, in the same class, there are degrees of propinquity and remoteness; as the descendants of children, of brothers and sisters,of uncles and aunts, &c., are more remote than their roots. And while the Statute did not mean to exclude any of these remotes branchs of a class called ot the inheritance, the same principles of natural affection prescribed, that those of the class, who were nearest the intestate, should have the largest portions; and to effectuate this object, to settle these proportions among the different branches of the same class, (and solely for this end, as it seems to me,) the Statute has called to its aid the jus representationis, a rule common to the Civil and Common Law, though of different extent in the two Codes. Thus, (by section 16,) “When children of the intestate come into partition, they shall take per capita; that is to say', by persons; and where a part of them being dead and a part living, the issue of those dead have right to partition, such issue shall take per stirpes, or by stocks; that is to say, the share of their deceased parent:” So of mothers, brothers and sisters, grand-mother, uncles and aunts, and the remoter classes, each in its turn. This is the second rule of which I spoke, and I understand it thus broadly: “That wherever several persons succeed to the inheritance at the same time, if they are all related to the intestate in equal degree, they shall take by persons ; but, if part of them be more remote, those shall take the share of their deceased parent.” If *it be objected, that the words of the 16th section do not justify the deduction of a rule so general as this, but one restricted to the cases there mentioned, I answer, that the cases put are those qu<e frequentius accidunt, that nothing is more common, than for Statutes to put such cases as examples of a general rule ; it being impossible for the Law to enumerate every case, and that here we must give such extension to the rule, or violate the whole scheme and reason of the Statute. But lake it, that the rule of the sixteenth section extends to those cases only which are there put, it by no means follows, that the Act is defective, and a resort to another system proper. No! The first rule com *720 prehends and governs every case not within the second. If you say, that the jus representations can only have place in the cases specially stated in the sixteenth section, then under the first, every person of a- class that takes, must take per capita. It is a question between the different sections of the Act merely, and however decided the Law, taken as a whole, is equally complete and comprehensive, and equally abrogates the Common Law. And such was the decision in Brown v. Turberville, 2 Call, 390, which in my opinion is a strong case on the subject. It was suggested, that the question in that case was merely vho should take, not in what proportions, and that every thing beyond this point was extra-judicial; but, that was clearly a mistake: the question was a much larger one. If the case was within the provisions of the Act of Descents, there could be no question who should take: the estate must have been divided into two moieties, and one would go the Plaintiffs, as representing the maternal line, the other to the Defendants, as nearest kindred of the paternal line. But the question was, whether the case was to be decided by the Statute, or the principles of the Common Law. The Legislature having omitted some words in the seventh section, which, if they could not be supplied, would operate, as was contended, a repeal of the Statute of 1785, as to the case at bar, and the *case being thus without the Statute, must be decided by the Common Law. The effect of the Statute of 1785, upon the Common Law, was thus brought directly before the Court. Judge Fleming says, “The Legislature conceiving that the Rule of Descents by the Common Law, was not well adapted to the genius of the people, and the form of our Government, totally changed it by the Act of 1785, which appears to have provided for every possible case.” Judges Carrington and Lyons, though they do not express themselves so explicitly, seem to have had the same idea. But Mr, Pendleton, (who, it must be recollected, was one of the three who drew the Act of Descents,) could not be more clear and explicit than he is. He says, “To enquire from what source the force of the Common Law of England in this State, is derived, would at present be a useless speculation, since all agree that it is the general Law of the land, where it is not taken away by our Statutes. That the Act of 1785, has totally done away -that Common Law, as to the course of Descents, has not been nor can be doubted. The rights of primogeniture are wholly abolished; and wherever there are more persons than one, of equal degree of kindred to the intestate, they share equally in the succession. The succession in the right line ascending, excluded by the Common Law, is here permitted. . The objection to the half blood is removed, and the enquiry, through what blood the lands have descended to the intestate, is abolished. The intestate, is in all cases considered as the unrestrained proprietor; and his supposed preference, from natural affection, pursued under this Act, it must be acknowledged; that no possible case, not provided for, can arise, so as to let in the rule of the Common Law.” Surely it cannot be said that this was an obiter opinion, that the mind of this enlightened Judge, was not turned to the subject, when he has stated with such admirable brevity and clearness, all the great principles of the Common Law, which the Statute has abolished. If (as is now contended) the Statute of Descents *meant merely to point out the persons or classes who should succeed to the inheritance, and to designate in some enumerated cases, the proportions in which they should take, leaving all others, (and thousands may happen,) to be settled by the principles of the Common Law, is it not passing strange, that this Judge (so familiar with the subject,) should have solemnly pronounced “that the Act of 1785, has totally done away the Common Law as to the course of Descents,” and that “under this Act, no possible case, not provided for, can happen, so as to let in the rule of the Common Law?” I cannot believe he could so grossly have mistaken the meaning and the effect of a Law, all the principles of which he had a hand in settling. Again: In Templeman v. Steptoe, 1 Munf. 339, Judge Tucker lays it down, “as too plain to require proof, that by the Act of 1785, all former Rules and Canons of Inheritance and succession to estates within this Commonwealth, whether established by Common Law, or by Statute, were rescinded, abrogated and annulled, and that they cannot be revived in any manner but by some express legislative provision for that purpose.” In the same case, Judge Roane says, “The first section of the Act of Descents purports to provide a rule of inheritance as to all cases, and which idea is entirely supported by the opinion of this Court in Browne v. Turberville. ” I conclude, then, that by the Act of 1785, the Common Law of Descents is wholly abolished, and can no more be resorted to at this day to influence the decision of causes, than if it had never existed.
Let us enquire now into the origin of our Statute, whether it is not substantially taken from the Statute of Distributions and the Civil Law? I think this enquiry will strengthen considerably the position taken, that the sixteenth section meant to establish it as a general rule, that equals in degree of kindred take equally, but where part of the class is dead leaving issue, such issue take per stirpes. The most important provisions of our Statute of Distributions, (as taken from the Revisal of 1748,) are, that after *debts, &c. are ' paid, the surplus of the personal estate (except slaves) of every person dying intestate, shall be distributed among the wife and children, or children’s children, if any such, or otherwise, to the next of kin to the dead person in equal degree, or representing their stocks, according to their respective legal rights, and the rules and limitations herein-after expressed, and not otherwise: that is to say, one-third to the wife of the intestate, the residue to and among his children in equal proportions, and if any of them be dead, to such person or persons as legally represent them. If no children, not their legal representa *721 tives, one half to the wife, the other to the next of kin who are in equal degree, and those who legally represent them; if no such kindred, the whole to the wife: no representation admitted among collaterals, after brothers’ and sisters’ children. There is also a provision taken from 1 Jac. 2, ch. 17, that if, after the death of the father, any child shall die intestate without wife or children, the brothers and sisters shall have his estate equally with the mother. This Statute, I have said, was taken from the Civil Law, and must be construed according to its rules. All the numerous cases upon the Statute lay this down. Thus, when the Statute says, that in defect of children the estate shall pass to the next of kin, we must look to the Civil Law to ascertain who they are. In Lloyd v. Tench, 2 Ves. sen. 213, Sir John Strange says, “some things are so clear they need only to be mentioned: as first, in all questions on the Statute of Distribution, the rule to go by, in computing the degrees of proximity of blood, must be taken from the Civil Law; and on this ground and foundation, stand all the cases which have come in Judgment since the Statute of Distribution, either at Law or in this Court.” Who then, are the next of kin, when the descending line is exhausted? The father and mother. In England, the father of course, takes in exclusion of the mother, but if there were no father, the mother would have taken in exclusion of her children, but for the Slat. 1st Jac. 2, under which, if the ’'father be dead, the mother, brothers and sisters, take per capita; and if any of the brothers or sisters be dead, leaving issue, such issue will take per stirpes, but here representation ceases: all beyond, come to the inheritance according to proximity ot blood, reckoned by the rule of the Civil Law, the nearer excluding the more remote, and where several of the same grade concur, all taking per capita. Nor is the half blood any objection, for they are in the same degree of kindred as the whole. No one can examine this course of succession, without being struck with the strong and clear resemblance which our Law of Descents bears to it: and whoever will look into the Civil Law, especially to the 118th Novel of Justinian, (Corp. Jur. Civ. vol. 1st, 606, Cramer’s Ed.) will be convinced that that is the fountain from which both these streams have tlowed. But, though there is this strong general resemblance, there are several points in which our Statute has varied from its models. The most important of these is the jus representationis. This, we know, was at the Common Law, universal, whether in the descending or collateral line. In the Civl Law it held as to descendants in infinitum ; as to ascendants, not at all; as to collaterals, it extended to the children of brothers and sisters of the intestate, no further. The Statute of Distribution has, certainly, copied the Civil Law with respect to representation among collaterals, stopping it at the children of brothers and sisters. Whether it has followed that Code as to the ascending line, is not so clear. Professor Cooper thinks not, as may be seen in his Notes on the- 118th Novel, (Coop. Just’n. 394.) He puts this case: A. dies leaving grand-children by three different sons, already dead; three by one, six by another, and twelve by another. There is no reported adjudication in the English Books on this point, which I have been able to find; and Mr. Cooper states that he has seen none,but thinks it probable, that the Courts there, would in such a case, order the division to be made among the grand-children per capita; and this, partly from a motive of equity, and partly from a consideration of the intent of the ’’Statute, which directs an equal and just dis-. tribution: and, when the Act mentions representation, it must be understood to refer to it, in those cases only, where it is necessary to prevent exclusion ; not where all the claimants are in equal degree, and therefore can take each in his own right. I confess, there seems to me, a good deal of forcing this teasoning; but, as it is not necessary to the decision of this case, I have formed no opinion upon it. Our Statute, setting oui with the broad declaration, that the state shall descend to the kindred, male and female, of the intestate in parce-nary; and calling that kindred to the succession by classes, has resorted to the right of representation, for the sole and exclusive purpose of adjusting the proportions in which the nearer and more remote branches of each class shall share the inheritance ; and so far as it is necessary for this purpose, the Statute has applied the principle without limit, as well to the collateral an the descending line. Another difference between our Statute and its prototype is, that when it takes up a class, it exhausts it, before it calls another; thus, it is not mother, brothers, and sisters, only; but, mother, brothers, and sisters, and their descendants, or such of them as there be, and so of the other grades; and this is by the extension of the jus representationis, which, embracing the whole class, brings the most remote members of it into the succession with the rest. Another difference is as to the half-blood; the Common Law excludes it wholy, the Statute of Distributions not at all; the Civil Law, if there be brothers and sisters of the whole blood or their children, excludes brothers and sisters of the half-blood, but if there be none of the whole, then the hall-blood are called. Our Statute calls collaterals of the half-blood along with those of the whole, but gives them half portions only. These differences prove to me this, and nothing more: that the framers of our Law did not act as mere copyists; but, availed themselves of the lights which their profound learning, great experience, and sound judgment furnished, to improve *upon the systems from which they were borrowing, and adapt them more exactly to the state and, condition of their country. Most ably did they perform this duty; and I trust that the Statute, as a monument of their skill, may be suffered to descend, un-defaced, to late posterity; et nati natorum et qul nascentur ab illis.
There are other reasons which satisfy me, that the Statute of Descents meant to conform in the main points to the Act *722 oí Distributions. In the printed report of Prepared Bills, made by the Committee of Revisors to the General Assembly, at page 16, we find the “Bill directing the course of Descents,” (marked in that report, chapter 20;) andón the same page commences the “Bill concerning Wills; the distribution of Intestates estates, &c,” (marked in that report, chapter 21.) This last Daw enacts, that after debts, &c., and the portion of the widow, the surplus of'the personal estate of intestates, “shall be distributed in the same proportions, and to the same persons, as lands are directed to descend, in and by an Act of the General Assembly, entitled, “An Act directing the course of Descents.” And these two Acts are passed together by the Legislature, at their October Session of 1785. making chapters 60, 61. 12 H. St. B. 138-40. This is a positive Declaration, that Descents and Distribution should be identical; that land and personality" should pass to the same persons, and in the same proportions: Was it intended by this to change the course of Distribution, so just in itself, so exactly suited, by its spirit of equality, to our situation? Was it meant to place personal property under the guidance of the Common Daw, with its feudal principles of preference and exclusion? A thing never done even in England, the personality there, being always regulated by the Civil Daw, as administered in the Ecclesiastical Courts. It is impossible to believe this, and yet it must be so, unless we admit that the Statute of Descents meant to abolish all the principles of the Common Daw in relation to this subject.
* Another piece of evidence has lately come to my knowledge, which, as tending to show the understanding of the Revisors, has strengthened and confirmed the opinion I had already formed; and which I think it not improper to state. Having some faint recollection, that in a conversation with Mr. Jefferson formerly, he had mentioned that he drew the Daw of Descents, I thought there might be something among his papers casting light on its origin. I therefore wrote to a gentleman, who has access to his papers, requesting him to send me an extract of any thing he might find on that subject. I received from him the following passage taken from a memoir of himself, written by Mr. Jefferson, and which, I understand, will probably be published during the present year. I may, therefore, I presume, appeal to it as matter of history. It will be recollected, that of the committee of five appointed to make the Revision, Mr. Jefferson, Mr. Wythe, and Mr. Pendleton, were the only members who acted, though the whole plan was settled before the death of Mr. Dee, or the resignation of Mr. Mason. The memoir says, “The other two gentlemen and myself divided the work among us. The Common Daw and the Statutes to 4th James 1st, (when our separate Degis-lature was established.) was assigned to me; the British Statutes from that period to the present day, to Mr. Wythe, and the Virginia Daws to Mr. Pendleton. As the Daw of Descents, and the Criminal Daw, fell of course within my portion, I wished the committee to settle the leading principles of these as a guide for me in framing them: and with respect to the first, I proposed to abolish the Daw of Primogeniture, and to make real estate descendible in par-cenary to the next of kin, as personal property is by the Statute of Distribution. Mr. Pendleton wished to preserve the right of primogeniture; but, seeing at once that that could not prevail he proposed we should adopt the Hebrew principle, and give a double portion to the eldest son. I observed, that if the eldest son could eat twice as much, or do double *work, it might be a natural evidence of his right to a double portion; but, being on a par in his powers and wants, with his brothers and sisters, he should be on a par also in the partition of the patrimony; and such was the decision of the other members.” I leave this extract to speak for itself. I will only further remark on this point, that I have no doubt that our Act was taken (with the changes stated) from the Statute of Distribution and the Civil Daw.
How, then, would such a case as ours be decided under these systems? We must remember there are eleven claimants descended from a brother and sister of the intestate in the manner before stated. This is a case of collateral kindred called to the inheritance. We must recollect, that in the collateral line, representation extends only to the brothers’ and sisters’ children of the deceased, under the Statute of Distributions and the Civil Daw, while with us it is unlimited. To test the principle, then, we must look for cases within the range of representation with them ; that is, cases where brothers and sisters of the intestate concur, or where a part of them being dead, their children concur with the survivors; or where all the brothers and sisters being dead, leaving children in unequal numbers, those children concur. There can need no case to show, that where brothers and sisters concur alone, they take equally. Walsh v. Walsh, Pre. Che. 54. A. has three brothers; one dies, leaving three children, another two, and a third five; then A. dies intestate. Per Dord Keeper. On time taken to consider of this case, distribution shall be per capita and not per stirpes; and that all the children should have equal, because none take by way of representation, but all in equal degree, as next of kin. Johnson v. Bury, Bunb. Rep. 157. B. had several brothers and sisters, (some of the half, and some of the whole blood,) who all died in his life-time, leaving several children ; and now, upon a Bill for distribution of his estate, it was decreed per totam curiam, that the distribution should be per capita, and not per stirpes; for, now *they do not take by representation, but as next of kin. But, if one of the brothers or sisters of B. had survived him, the children of the rest must have taken only by representation; that is to say, per stirpes, and the case of Wall and Theedliam, was cited by the Court. W. died intestate: He had two sisters, Susanna, of the half blood, Elizabeth, of the whole: Both died before him, one leaving *723 one child, the other three. The estate was divided into four equal parts, and they took per capita. The case of Clarkson v. Sparteman, was also cited, in which the Judges Delegates decided, “That distribution should be per capita, and not per stirpes, all the old stock being gone; for, they claim as next of kin, and not by representation ; aliter, if any of the old stock had survived.” Lloyd v. Tench, 2 Ves. sen. 215, Sir John Strange says, “If there is one brother living, and another has left children, however many, they take but a moiety with the brother: but if that brother had been dead, all in the same line of «quality take per capita.” Bowers v. Littlewood, 1 P. Wms. 595, Lord Chancellor said, “It may seem hard, that if an intestate leave a deceased brother’s only son, and ten children of a deceased half-sister, the ten children of the deceased half-sister shall take ten parts in eleven with the son of the deceased brother; and yet the Law is so, because they all take per capita, and not by way of representation.” I will not cite, (though I could) more cases to this point. These are surely enough to show, that under the Statute of Distribution, it is a general rule, that equals in degree take equal portions, and that representation is only resorted to, to bring in one more remote; in which case, he takes per stirpes. The same rule holds in the Civil Law. Thus, Cujacius, vol. 2, 553, in his Exposition of the 118th Novel, says, “Suc-cedunt quidetn fratrum filii cum fratribus defuncti in stirpes, non in capita; quod si soli sint fratrum filii, sucsedunt in capita.” Huberus also, vol. 1, 277, De successione ad intestato lays down the same doctrine expressly *as settled. Heineccius, in his Elementa Juris, p. 218, sec. 696, lays it down, that the sons of brothers, if they come alone to the inheritance, take per capita; if with their uncles, per stirpes. Domat also, in his Civil Law, vol. 1, 686, puts the case of brothers and brothers’ children, and considers it established Law, that where the children concur with their uncles, they take per stirpes; when with one another, per capita. Thus we see, in both these systems, the foundation of the rule, established by the 16th section of. our Act, that equals in degree take equally, while representation is used only to take in the more remote of the class, and to assign them the share of their parent; and the rule in our Law is only more extensive, because representation is unlimited; and when we call a class as next of kin, we embrace the remotest members of it, to all of whom, whether children, grand-children, or great grand-children of the class, the rule extends, equals, equally, unequals, per stirpes. Applying this rule to the case before us, I would divide the inheritance into as many parts, as there were members of the grade nearest the intestate, of which any survive, taking the survivors, and those who have died leaving issue. Thus, Anthony Gardner left a niece and two nephews living, and had had two other nieces, who died before him, leaving issue. I would, therefore, divide the estate into five equal parts, of which each living niece or nephew (I mean living at the death of A. G.) should have one, and the other two should go, one to the issue of Mrs. Boyd, the other to the issue of Mrs. Shackleford, to be divided among them according to the same rule. Those who contend that this is a case without the Statute, and to be decided by the principles of the Common Law, would place Mrs. Davis in the shoes of her father, and give her one half the estate, leaving the other half to go among the ten other kindred, two of whom are as near to the intestate as herself. It is never for a purpose of this kind that the Statute of Descents resorts to the jus representationis. There are several *other proofs, (and strong ones too,) which have occurred to me as showing still further, that our Law draw its origin from the Civil Law; but, I pass them over, having already dwelt upon the subject too long. If I am wrong, it has not been for want of laborious investigation and anxious reflection on this important and interesting subject. Nor do I err alone, but in company with the fathers of the Law, the coterriporaneous exposition, and the general understanding of the country. I think the Decree ought to be affirmed.
JUDGE GREEN.
This case presents, for the first time, the question, whether the nephews and nieces, and grand-nephews, and grand-nieces of the intestate, succeeding together (his mother, brothers and sisters being dead,) shall, under our statute of Descents, take per capita, or in stirpes: and if in stirpes, whether the deceased brothers and sisters, or the living nephews, and nieces who have left children, shall be taken as the stocks.
It is admitted, that the Statute does not in terms provide for such a case. These questions must, therefore, be determined upon the best construction which we are enabled to make of the Statute itself, aided by a due attention to the Laws of Descents and Distribution, in force when it was enacted.
The Common Law of Descents looked for the heir of an intestate, first amongst his children or their descendants, if any there were. If there were none such, then amongst his brothers, and sisters, and their descendants, if any there were. If there were none such, then amongst his uncles and aunts, and their descendants, if any there were, and so on, without end, passing to the children, and their descendants, of the nearest ancestors of the intestate, any of whose descendants existed, excluding in all cases the ancestors themselves. Of all who could by possibility succeed *to the inheritance, the children alone, (either of the intestate or his nearest ancestors, as the case might be,) could claim jure suoproprio; and when several such children succeeded together, they took per capita. All others, (to wit, the descendants of such children,) could only claim as representing such children, and as succeeding jure representationis, to what they would have been entitled to, if alive; and when several such descendants so succeeded together, they’ succeeded in stirpes by stocks: that is, each descendant repre- *724 seated his immediate parent, and took what he would have taken if alive, and no more. Thus, if there were grand-father, father and son, and the grand-father would, if living, be the heir of the intestate jure proprio, as being the child of one of his ancestors, and the grand-father, and father were dead before the intestate, the son could not ciaim as the immediate heir of the intestate, even if in his own person he was his nearest of kin, nor as immediately representing his grand-father, who, if alive, would have been heir, but as representing his own father, who, if alive, would have represented the grand-father. And so, the son would represent the grand-father through the medium of the father: and in such case, the descent would b'e mediate, and the grand-father and father would transmit the inheritance to the son. The consequence of this principle of representation was, that 'if any intermediate ancestor, who by possibility might have inherited, if alive, was disabled to inherit himself, by reason of his alienage, bastardy, or attainder, he could no longer transmit the inheritance to his descendants, since he would, if alive, have been incapable of taking it himself. Thus, in the case of the grand-father, father, and son before stated, in which the grand-father, if alive, would be heir to the intestate, if the father was disabled as aforesaid, the son would be barred of the inheritance; for, representing the father, who, if alive, could take nothing, he can take nothing. And so, if the grand-father was disabled, the son would be barred for representing the father, and entitled to take only what he, if alive, could have *taken, and the father, if alive, representing the grand-father, and entitled only to take what he could have taken, if alive, and he being incapable of taking any thing by descent, the grand-son could take nothing, as thus mediately representing him. The disability, however, of an ancestor, common to the intestate, and his brother or other collateral heir, whether by alienage, bastardy, or attainder, was no impediment to a descent between them, because, the Law prohibiting the ancestor to succeed in any case to his own descendant, nothing could in any case be claimed, in respect to the inheritance, of any of is descendants, by any other of his descendants, as representing him; and the inheritance was consequently never transmitted through him: and therefore, a descent from brother to brother, was held to be an immediate descent. Another consequence of these principles of descent and representation, was, that no one could succeed, with his own ancestor living, to the inheritance; nor at all. if any of his ancestors was living, except in the case of a common ancestor, whose existence in full life was no impediment (for the reason aforesaid) to a descent between his descendants.
These general rules, which applied universally to all descents, even those of Gavelkind .and 3orough English, were directed in their application to each particular case, by various other rules, namely ; the maxim paterna paterriis, v aterna maternis, •which restored estates descended on the part of the father to the paternal, in utter exclusion of the maternal kindred, and vice-versa; that in all descents to collat-erals, the male lines throughout should be preferred to the female lines; that the half-blood should be wholy excluded; that males should be preferred to females, and amongst males the oldest; and that females should succeed together in parce-nary. (a)
*In respect to the distribution of personal estates: before the Statute of Ed. 3, by the theory of the Law, the personal estates of intestates devolved upon the Ordinary, to be applied to pious uses. In practice, the Ordinary usually distributed them to the wife and children, and kindred of the intestate, according to the customary Law,(b) which agreed with the Civil Law, as it existed before the time of Justinian, by which, if there were no children, the father was preferred to all others, excluding the mother, (c) That statute directed that the Ordinary should depute the next and most loyal friends to administer. Under this Statute, the husband was considered as his wife’s next and most loyal friend, and was preferred to all others; the wife and children as the next and most loyal friends of the husband, and next to them, the father. The Statute of Hen. 8, directed administration to be committed to the widow, or next of kin, allowing the Ordinary to elect between two or more in the same degree of relationship. Under these Statutes it was held, that the Administrator could not be compelled to make distribution; in consequence of which, the Statute of 22d and 23d Car. 2, ch. 10, directed distribution to be made equally to the children, (after payment of debts, and the provision for the widow,) or to such persons as legally represented them, if any were dead; and if there were no children, nor any legal representatives of them, then equally amongst the next of kin in equal degree, and their legal representatives, provided that no representation be admitted beyond brothers’ and sisters’ children. Under this Statute, although in case of a failure of descendants, the next of kin in equal degree *were appointed to take, yet by virtue of an expression in another part of the Statute, directing distribution to be made “to the next of kin pro suo cuique jure according to the Law in such cases,’’ the ancient preference given to the husband, was con *725 tinued and sanctioned by a subsequent Statute, 29th Car. 2, ch. 3. And next to him, if there were no descendants, the father, who was preferred to the mother, though in equal degree; and the mother excluded brothers and sisters, (a) But this preference of the male to the female ancestor, was strictly confined to the case of father and mother. All other ancestors in the same degree, male and female, succeeded together.(b) And in respect to the preference of the mother to brothers and sisters, and their children, the Statute of James 2, provided, “that if after the death of the father, any of the children should die intestate, without wife or children, in the life-time of the mother, the brothers and sisters, and their representatives, should take equal shares with the mother.” These Statutes were introduced into our Code in 1705, and continued in force when our Statute of Descents was enacted in 1785.
These Statutes, except in the preference given by them incidentally to the husband and father, in the manner already stated, conformed in their provisions, in the main, with the 118th and 127th Novels of Justinian, which called the father, mother, brothers and sisters together; and in all cases of doubt, the English Statutes were ■construed according to the Civil Law. (c)
Some views which have been taken of the case under consideration, make it desirable to understand the full effect of these Statutes of Distribution, and the principles on which they are founded. And first, what principle do they prescribe as to the succession of descendants? Do *they, in all cases where any, or all of the children are dead leaving descendants, take in stirpes, all the descendants of each child respectively representing him, and taking the share which he would have taken if alive? Or, if all the children are dead leaving children in unequal numbers, do these grand-children succeed per capita, taking jure proprio as next of kin? And, if some of these grand-children are dead leaving children, do the latter take in stirpes, with the grand-children, living representing the deceased grand-children as their stocks?
It is remarkable, that these questions have never occurred in England in such a form as to make them the subject of a direct judicial determination ; a circumstance which, I think, can only' be accounted for by the supposition, that it has been universally considered there, as a question susceptible of no doubt, and that in all cases, descendants must take as children, or as representing them. This is the precise and literal effect of the terms of the Statute: “distribution shall be made equally to the children, or such persons as represent them, if any be dead,” carefully avoiding any terms which might be construed to direct the distribution to be made to descendants in equal degree, and confining the claims of all descendants to children and such as represent them, that is, stand in the place, and entitle themselves to the rights, which the deceased children would have had if alive. This opinion is intimated by Chief Justice North, in Carter v. Crawley, T. Ray. Rep. 496, and plainly declared as his by Lord Hardwicke in Wythe v. Blackman, 1 Ves. sen. 196. And if there was any room for doubt upon the words of the Statute, an examination of the Civil Law upon this point, to which the Statute was intended to conform, and according to which it is construed in ali doubtful cases, would remove it.
In the original frame of the Civil Law, as found in the 12 Tables, no representation was allowed in any case, either amongst descendants, or collaterals: The rule, that the nearest in degree excluded the more remote, being inflexibly *enforced in all cases, and this by force of two very succinct Laws: the one “In-testatorum hereditates primo hasredum suorum, velint nolintve, sunto,” by force of which, children excluded grand-children : (Vult. 374,) the other “deficientibus suis hasredibus proximus agnatus familia m habeto.” (Id. 375.) This Law called the next agnate, only in case all the proper heirs (that is, descendants) failed: and the first of those heirs, that is, the nearest in degree, was preferred amongst them: so that, “Liberis primi gradus non exist-entibas. nepotes defuncti succedebant. ” (Id. 374.)
Before the time of Justinian, these Laws were variously modified, and representation amongst descendants allowed, but upon what principle, I do not find distinctly stated; but, no representation was ever allowed amongst collaterals, until Justinian allowed it, as a single exception to the general rule, in favor of brothers’ and sisters’ children concurring with father, mother, brothers or sisters living. By the 118th Novel he utterly abolished degrees amongst descendants, in terms, and declared, that “if any of the descendants of the deceased should die, leaving sons, or daughters, or other descendants, they shall succeed in place of their own father, and shall be entitled to the same share of the intestate’s estate, which their father would have had, if he had lived;” which necessarily led up to the children as the stocks, to which representation was ultimately to be made. And there is no point in the Civil Law, in which ali Civilians more unanimously agree, than in this construction of the Novel ;(d) as Judge Cooper in his Justinian agrees, though at the same time he ventures an opinion, that the English Judges would determine otherwise, (e)
I think it is perfectly clear, that in the succession of descendants, the principle of representation has precisely the same effect in the Civil Law, the Statutes of Distributions, and the Common Law of Descents; that all descendants, ^except children, (who alone can claim jure *726 proprio, and take per capita,) must come into the succession, as representing their parents, through ail their grades, no matter how many, up to the children of the intestate as the stocks according to which, partition or distribution is to be made.
As to the succession of ascendants and collaterals, the Statute of Distributions provides a general rule, in strict conformity with the original rule of the Civil Daw, that distribution shall be made “amongst the next of. kin in equal degree,” in all cases, except that the father is still preferred, as he was by the Ancient Daw, to the mother; and the brothers and sisters, and the children of such of them as are dead, succeed, with the mother, by force of the Statute of James 2d, the children representing the deceased brothers and sisters, and the children of brothers and sisters succeed with living brothers and sisters, the children representing their parents. In no other case, does the Statute allow of representation amongst collaterals, not even to the grand-children of brothers apd sisters ;(a) nor in any other case relaxes the rule, that the nearest in degree exclude the more remote. And in ascertaining the degrees, the Civil Daw rule, quot per-sonas, tot gradus, has been adopted, and never departed from, except in one single case, (where the brother has been allowed to exclude the grand-father, although in the same degree, upon the Common Daw rule of computing degrees, by which brothers are in respect to each other iu the first degree, and the descent between them, as before noticed, immediate;) (b) a decision obviously disapproved of in subsequent cases, in which it has been held, that grand-fathers and grandmothers exclude, and great grand-fathers, and great grand-mothers, and uncles, and aunts, succeed with brothers’ and sisters’ children, where no mother, brother or sister is *alive; that is, where they have not the benefit of the right of representation ;(c) and no distinction was made between the whole and half-blood. (d)
In the only case in which representation is allowed amongst collaterals, that of brothers’ and sister’s children, where there is living a mother, brother or sister, it has been held, that if there be no mother, brother or sister living, they cannot take by representation to their parents, so as to vary the proportions amongst themselves, or to exclude others in the same degree, or to avoid being excluded by others in a nearer degree. Thus, in such case, they are excluded' by grand-fathers and grandmothers, and concur, and take equally per capita, with uncles and aunts, all of whom would be excluded, and the children of brothers and sisters take, if there were a mother, brother or sister alive (e)
These seemingly inconsistent consequences, arise out of the peculiar frame of the Daws which arealike in the Civil Daw, and the Statute of Distributions. The general rule is, that the next of kin amongst collaterals, shall take equally, and exclude the more remote. To this general. rule, there is one exception ; that if there be a mother, brother or sister, the children of brothers and sisters may come into the distribution, as representing their deceased parents, and take the shares to which they would be entitled, if alive. If this precise case does not occur, (in which alone they are entitled to the benefit of the right of representation,) their case falls within the general rule; and if they are the next of kin, they take, as such, equal shares, excluding all others, as the grandchildren of brothers and sisters;(f) or, if in equal degree with others, take “'equally with them per capita ; or are excluded by such as are nearer of kin as aforesaid.
Here let us notice the circumstances in which the Statute of Distributions, and the Common Daw of Descents, so far as the principle of representation operates in the succession of collaterals, agree, and in what they differ. In the only case in which the Statute of Distributions admits, of representation amongst collaterals, they agree precisely. The representation is made in that case to the children of the nearest ancestors of the intestate, as in the case of descents. In all other cases, by force of the Common Daw. principle of representation in descents, the descendants, however remote in degree, of the nearest ancestors of the intestate, representing the children of such nearest ancestors, exclude the descendants, however near in degree, of more remote ancestors. But, the Statute of Distributions calls together the descendants of ancestors in different degrees, provided those descendants are in their own persons in equal degree; and the descendants of ancestors in a more remote degree, who are themselves nearer in degree, es-cude those of ancestors in a nearer degree, who are themselves in a more remote degree. Thus, suppose a grand-son of a brother, the son of an uncle, and a great uncle. By the Common Daw of Descents, the grand-son of the brother would exclude ali the rest, but under the Statute of Distributions, all would succeed per capita together, or if there were an uncle, he would exclude the grand-son of a brother: the latter of whom would exclude the former under the principles of the Common Daw of Descents. In short, so far as the principles of representation was concerned, the Common Daw of Descents applied the same rule to the succession of collaterals, as to that of descendants, preferring him who-was nearest in degree by representation, no matter how remote, in his proper person, in all cases, to him even if nearer degree, in his proper person, whose common ancestors was more remote than the common ancestor of the person preferred: whilst the Statute of Distributions preferred all (except in “'one particular case) *727 according to their degrees of propinquity in their proper persons, without regard to the degree of the propinquity of the common ancestor.
Such were the principles of our Laws of Descent and Distribution, when our Statute of Descents was enacted ; bearing these in mind, let us proceed to examine its provisions.
It directs that the estate of an intestate, ■‘shall descend, and pass in parcenary to his kindred, male and female, in the following course: To his children, or their descendants, if any there be. If there be no children, nor their descendants, then to his father. If there be no father, then to his mother, brother and sisters, and their descendants, or such of them as there be. If there be no mother, brother, nor sister, nor their descendants, then the inheritance shall be divided into two moieties, one of which shall go to the paternal, the other to the maternal kindred, in the following course: That is to say; first, to the grandfather. If there be no grand-father, then to the grand-mother, uncles, and aunts on the same side, and their descendants, or such of them as there be. If there be no grand-mother, uncle, nor aunt, then to the great grand-fathers, or great grand-father, if there be but one. If there be no great grand-father, then to the great grand-mothers, or great grand-mother, if there be but one, and the brothers and sisters of the grand-fathers, and grand-mothers, and their descendants, or such of them as there be. Sec. 10. And so on, in other cases, without end, passing to the nearest lineal male ancestors, and for the want of them, to the lineal female ancestors, in the same degree, and the descendants of such male and female lineal ancestors, or to such of them as there be.” The 11th, 12th, and 13th sections provide, that no person other than children of the intestate shall inherit, unless in esse, and capable in Law to take as heirs, at the time of the intestate’s death ; that if there be no maternal kindred, the whole shall go to the paternal and vice versa : and if no kindred, to the wife or *husband, or to their kindred: and that the half-blood shall take half portions, and if all be of the half-blood, the ascendants (if any) shall have double portions. Then comes the 14th section, (the 16th in our present Statute,) which provides, “And when the children of the intestate, or his mother, brothers and sisters, or his grand-mother, uncles and aunts, or any of his lineal female ancestors living, with the children of his deceased lineal ancestors, male and female, in the same degree, come into the partition, they shall take per capita; that is to say, by persons; and when a part of them being dead, and a part living, the issue of those dead have right to partition, such issue shall take per stirpes, or by stocks; that is to say, the share of their deceased parent.”
These are all the provisions of the Statute, which designate the persons to take, and proportions in which they are to take. None of these extends in terms to the case at bar, for here is no child, nor mother, brother, sister, grand-mother, uncle, aunt, or female ancestor, or child of a deceased male or female ancestor, to come into the partition; in which cases only, does the Statute prescribe the mode of distribution ; and the same rule which is applicable to this case of nephews and great nephews, (no mother, brother or sister being alive,) will apply to grand-children and great grand-children, (no child being alive,) and to all cases in which a female ancestor (beyond a grand-mother.) living, and her children, or their descendants, of the half-blood come into the partition, all of which are equally unprovided for by the terms of the Statute. There is extreme, and indeed insurmountable difficulty, in deducing any general rule from the terms of the Statute itself, by which to determine these preter-mitted cases, without supposing that some principle of the pre-existing Laws of Descent or Distribution, modified by the Statute, still remained in force, and provided for them. The provisions of the Statute designating the persons to take, would, in all such cases, entitle all who were so designated, to take *equal shares, unless there were something in the Statute itself, which, upon a just construction, would afford a different rule, or unless some such extraneous rule controuled this construction. This rule, that ail who are designated to take, shall take equally, unless some other ruléis prescribed, is dictated by common sense, is the settled and clear rule in the construction of Deeds and Wilis, (a) and the rule of the Civil Law in the construction of the Laws regulating the succession to intestates’ estates, (b) If the Authors of our ¡statute had intended to prescribe a new general rule, by which to ascertain in what case the heirs should take per capita, and in what per stirpes, and by which to determine who should be the stocks in all cases, without any regard to the Common Law principles of descent, or the former Statute of Distribution, and wholly independent of, and differing from, them both, nothing would have been easier than to announce such rule in the most concise terms, by declaring that where the children of the intestate, or any of his living female ancestors, and the children of his ancestors, male and female, in the same degree, came alone into the partition, they should take per capita; and if any or all of them were dead, their descendants coming into the partition, should take per stirpes, considering them as the stocks by which to make the partition; or, that when several In equal degree came into the partition alone, they should take per capita, but any in a more remote degree, coming into the partition with them, those should take per stirpes, as representing ultimately their ancestors, who, if alive, would have taken per capita, with those living, and in the nearest degree to the intestate. They surely never could have dreamed of establishing a general rule, by giving an example, from which it is Impossible to deduce any such rule. For instance, if we suppose they intended to establish the *728 general "rule, that the children of the intestate, or his female ancestors living, and the children of all his ancestors, male and female, in the same de-grée, should be the only persons entitled to take per capita in their own right, and that their descendants should in all cases claim as representing them, the example is imperfect, since it does not embrace the children of a living female ancestor, who, if of the half-blood, would not-be the children of any deceased ancestor of the intestate. Nor does it serve better as an example of a case in which those in equal degree are to take per capita, merely because they are in equal degree, and all others in more remote degrees, in stirpes, as representing their ancestors, who, if alive, would be in the same degree; for, in the example, the persons directed to take per capita, may be in unequal degrees; as the female ancestor living, and the children of deceased ancestors in the same degree. The framers of the Statute must, therefore, have thought it unnecessary to prescribe any general rule upon this subject, because in the former haws which they were engaged in re-forming, not in abrogating, there was a principle, not inconsistent with any of the provisions of the Statute, and therefore, not impaired, or abrogated, which would provide for all cases not specially provided for by the 14th section ; and must have inserted the provisions of this section for some distinct purpose unconnected with the establishment of a general rule of partition, a purpose which I think I shall be able to point out distinctly. This principle of the former Laws, which remained in full force, was the Common Law principle of representation in descents, which alone, of all the principles of the Laws of Descent and Distribution then in force, could operate universally, both in lineal and collateral descents; and by providing for all possible cases, make it superfluous to prescribe any other general rule. For, by the Statute of Distributions, representation was, only allowed in two cases; those of descendants, and of the children of brothers and sisters only, and the last only in a particular and excepted case; *in both of which, it conformed strictly to the Common Law principle of representation, referring the representation to the children of the intestate in one case, and to the children of his nearest ancestors in the other, as the stocks beyond whom there could be no further representation. In all other cases, the principles of the Statute of Distributions, if remaining in force, would have allowed of no representation, and left, in all other cases not specially provided for by the Statute, all the persons designated, as entitled to come into the partition, to take equal shares, according to the literal effect of the clauses so designating them to take.
Notwithstanding the repeated extra-judicial suggestions, that our Statute intended to abrogate the Common Law of Descents in toto, I am persuaded that, in this, as in all other cases, the object of our Legislature was to reform what was obnoxious to natural equity, and the spirit of our institutions in the Common Law, leaving such parts of it as was not liable to those objections, in full force, and not to abrogate it entirely, and establish a new system, as if no such thing as the descent of the estates of intestates to their heirs had ever been heard of in Virginia. There are many proofs in the provisions of the Statute itself, to show that not only the Common Law principle of representation, but many other principles of the Common Law of Descents were considered as in full force, except so far as they were modified by provisions of the Statute, introduced for the purpose of so modifying, and not of abrogating them in tofo. Some of the principles of the Common Law of Descents, to wit, that of paterna paternis, materna maternis, and the preference of male to female lines amongst collaterals, and of males to females, and of the eldest amongst males, and the exclusion of ancestors arfd the half-blood, were founded on Feudal Principles, the policy of which was to preserve estates entire or contrary to natural equity, and being inconsistent with the spirit of our institutions, were effectually abolished. But the Common Law principle ifof representation was founded on the broad principles of natural equity, and in no degree inconsistent with the policy of our institutions, since it has no tendency to preserve estates entire, and therefore was admitted in all cases in the Common Law of Descents. Nor can I feel the force of Judge Blackstone’s remark, that this mode of representation was a necessary consequence of the double preference of the males to females, and of the eldest, amongst the males; for, it existed in the Civil Law in the case of descendants, where there was no such preference, and also in the Common Law, whilst it allowed no such preference, and admitted all males and females alike, (a) and now prevails in respect to Gavelkind lands in England, to which all the male issue succeed together, and in parcenary. (Clements v. Scudamore, 1 P. Wms. 63; Littleton, sec. 265.) This principle is so familiar with us, that it is almost received as a Law of Nature, that children stand in the place of their parents, and take what they would have taken, if alive. And this was the opinion of the Civilians.
Vulteius, (or Vultijus) stating the case of all the grand-children succeeding in slirpes, as representing the children, says, “Nam quod succedunt avo suo, id . fit occasione parentum suorum, et ut ita dicam, medio et beneficio ipsorum.” (p. 379,) and noticing the introduction of this right of representation, which was unknown to the Ancient Law, and citing Ulpian, he says, “Ex quo apparet jus representations non veritate ipsa, sed fictione, niti quae tamen fictio fundata sit in naturali aequitate,” (p. 378.) This principle of natural equity was violated by the Laws of the 12 Tables, in order to preserve estates entire. This policy, however, in after times, yielded to the sense of justice, in favor of descendants, and brothers’ and sisters’ children only, both in the Civil Law, and the Eng *729 lish Law of Distributions. Whilst in the Common Law of Descents, full effect was allowed to the operation of this principle of natural ^equity, since it had no tendency to frustrate the policy of preserving estates entire, that object being most effectually secured by the sole succession of the eldest male, and the preference of male to female lines. It was upon this principle of natural equity, too, that the Common Law of Descents, instead of selecting, amongst collaterals, the kinsman of the intestate nearest in degree to him without regard to the degree of their common ancestor, according to the Civil Law and the Statute of Distributions, preferred the more remote kinsman descended from the child of the nearest common ancestor, as representing and standing in the place of that child, to a nearer kinsman, the child or other descendant of a more remote ancestor, and in this particular, our Statute pursues the principles of the Common Law, and repudiates those of the Civil Law, and Statute of Distributions. It also explicitly approves of, and adopts the Common Law principle of representation, in selecting the classes who are preferred to the inheritance. In this, it is in precise conformity to the Common Law, insomuch that many cases might occur, in which, under our Statute, and the Common Law, all the persons who would succeed under the one, would also succeed Uuder the other, as in every case where the principles of paterna paternis, the preference of male to female lines, and of males to females, and of eldest male, and the exclusion of ascendants and the half-blood, had no effect. Thus, if all were female descendants of the intestate, and descendants through females, all would succeed together, and take in parcenary alike, both by the Common Law and our Statute. And so of collaterals: if all the common ancestors were dead, and the estate was purchased by the intestate, and his only relations were female descendants, through females from his sisters, or aunts, or great aunts, on the part of his father, and of the whole blood, the same persons would inherit under both systems of Laws. If such a Statute as ours were enacted in England, all those principles which would otherwise prevent such a descent in any *case being thereby abolished, the same persons would take there, as here, under our Statute in all cases. And no one surely can doubt, but that such a Statute passed in England, would there leave the Common Law principle of representation untouched, then why not here: the Common Law, except so far as it is modified by our Statutes, or the circumstances of our country, being as much our Law, as the Law of England. This preference of classes of relations, bottomed upon the Common Law principle of representation alone, in which our Statute concurs with the Common Laws of Descents, is, I think, a persuasive proof, that that principle was approved of, and intended to be adopted, or rather left untouched by the Authors of our Statute.
There are other provisions in this Statute, and in others enacted very shortly after it, which, I think, decisively prove that this principle was considered as unimpaired by our Statute. We have seen, that the bar to all his descendants, created by the disability of an intermediate ancestor, through whom the inheritance must be transmitted to them, was founded solely upon this principle of unlimited representation. In the Civii Law, where the next of kin took jure proprio as such, a child who would be next of kin, if his father was dead, would take as such, although his father was alive, if his father was disabled to take by alienage, or was condemned for a crime which disabled him. 1 Domat, 583. The Authors of our Statute inserted in it a provision, “that in making title by descent, it shall be no bar to a demandant, that any ancestor through whom he derives his descent, from the intestate, is, or hath been, an alien. Bastards, also, shall be capable of inheriting, and transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother.” Provisions utterlj' superfluous, but upon the supposition that the Common Law rule of representation was in force, and every descendant of a child of the intestate, or of a child of an ancestor of the intestate, could only succeed as representing all his ancestors, intermediate ^between him and the intestate. This provision, whilst it took away the disability of alienage in lineal, left it untouched in collateral descents, as it now remains, and the disability arising from the attainder of an intermediate ancestor, was not taken away until 1789. (a)
It is to these cases, and one other which will presently be mentioned, that the expression in the 14th section refers: “where the issue of those dead have a right to partition supposing that in some cases they might not have such right.
The provision in the Statute modifying the disability of alienage, is very remarkable. It not only took away the impediment at Common Law, to the descent to the issue of an alien, by reason of his disability in the case of a lineal descent, in case such an intermediate alien ancestor was dead, but even if he were alive. This is the clear effect of the expression, “is, or hath been an alien;” thus making, in this single instance, an exception to the principle of the Common Law of Descents, that the issue of an intermediate ancestor alive, who might by possibility have been capable of inheriting, could never inherit in the life-time of such ancestor, whether he were disabled by alienage, or otherwise, or not; and in this, conforming to the principle of the Civil Law, as before stated.
Another provision, affording an additional proof to the same effect, is that respecting advancements to be brought into hotchpot. “And when any of the children of the intestate, or their issue, shall have received from the intestate in his life-time any real estate by way of advancement, and shall choose to come into the partition with the other parceners, such advancement shall be brought into hotchpot with the estate descended.” The Statute of Distributions only required advancements *730 made to the children of the intestate, and not such as were made to the issue of such children ; (a) and the. Common Law only required *lands given in frank-marriage, to be brought into hotchpot. This more enlarged provision on the subject of advancements, which was intended to provide a more equitable and equal distribution of estates than had been provided by the Statute of Distributions, or the Common Daw, in cases of parceners, was founded on the admission, that the Common Daw principle of representation was still in force, without which it might produce the most flagrant injustice. If grandchildren, all the children being dead, could succeed per capita, jure proprio, without representing and standing in the pla'ce of their parents, (the deceased children,) and bound to take the shares only, which they would have taken if alive, then, if a man had two sons, and advanced one to the amount of half of his estate, and the one advanced died in his father’s life-time, leaving four children, and the other child died in his father’s life-time, leaving one child, and then the father died intestate, these five grand-children taking, jure pro-prio, per capita, the children of the advanced chiid would be entitled to claim four-fifths of the estate, without accounting for the advancement made to their father, and thus would virtually get nine-tenths of the estate, leaving only one-tenth for the only child of the unadvanced child of the intestate. It is impossible, that the Authors of our Statute should have contemplated that such consequences could arise from the accidental circumstance of both the children of the intestate dying in his life-time. In Knight v. Yarborough, Gilm. 27, which was a case relating to the execution of a power of appointment, to which the Court obviously applied the principles of this Statute, and I think, gave it the just construction, it was held, that appointments in the nature of advancements made to a grand-child, after his parents’ death, should not only be brought into the division of the unappropriated residue, and considered as a part of his proportion in the division of his father’s share between his children, but also as a part of his father’s share in the grand-father’s estate, and this last, whether the grand-child chose to come into the partition, or not. If *the grand-child so represents his father, that advancements made to him, go to diminish his father’s share in respect to his other children, surely advancements to the intestate’s son must go to diminish the shares of his children underail possible circumstances. But, they would not have that effect, unless his children represented him under all possible circumstances.
Another provision of the Statute also shows, that the Common Daw principles of descents were considered as still in force, except so far as they were inconsistent with the provisions of the Statute. By tne Common Daw of Descents, if the eldest son died, in the life-time of his father, leaving his wife enseint of a child, and then the father died, and a younger son entered, as he had a right to do as heir, and after-wards the child of the eldest son was born, this child was the heir of the father, and displaced the title of the younger son, and so, of an elder and younger brother of the intestate, or any other collaterals, (b) The Statute provides, that “No right of inheritance shall accrue to any person whatever, other than to children of the intestate, unless they be in being, and capable in Daw to take as heirs (the parent not being disabled) at the time of the intestate’s death:’’ thus modifying, not abrogating, an acknowledged principle of the Common Daw of Descents.
It seems to me, therefore, that the scheme of the Revisors, who prepared this Statute, was to modify the Common Daw of Descents by abrogating all of its obnoxious principles, and modifying others, so as to adapt flem to the general policy of our Daws, leaving those not abolished, to operate *in full force, where not modified, and when modified, in their modified form. Accordingly, they abolished the rule paterna paternis, materna maternis; the preference of male to female lines, and of males to females, and of the eldest male, and admitted ascendants and the half-blood, partially. They adopted the Common Daw principle of representation explicitly, in its most important effect, in the designation of the order in which classes ot kindred should succeed, leaving it to operate as at the Common Daw in all cases, with a limitation upon it, in a single case imposed by the Statute, which I shall presently advert to: they modified the Common Daw principles as to the succession of posthumous children the impediments to a descent by the disability of an intermediate ancestor, and in respect to advancements; and they left untouched the Common Daw principle in relation to descents in parce-nary, which allowed to the eldest parcener, and in some cases to her representative, the choice of the lots in the partition, (c) a privilege shortly after abolished by Statute. (Oct. 1790, ch. 13, §6, and 13 Hen. St. Dar. 122.)
Considering the Common Daw principle of representation as not being abrogated, it might, at the first blush, seem to have been unnecessary to insert in the statute any provision in relation to the cases in which the persons coming into the partition, should take per capita, or per stirpes, and it is necessary to enquire for what purposes the provisions of the 14th section were introduced.
The Statute having admitted ancestors *731 to the inheritance, and preferred males to females in this instance only, and having directed that female ancestors should succeed with the descendants of all ancestors in the same degree with her, including those of the living female ancestors coming into the partition, the consequence would have been, (if not guarded against by the Statute,) that by' force of the Common Daw principle of representation still in full force, and *which requires representation in all cases to be made to the most remote ancestor of the claimant, who, if alive, might have inherited jure proprio, (he children of the deceased ancestors of the intestate, who, if alive, would have inherited jure proprio, (especially of deceased female ancestors,) might have claimed not only the shares which they are entitled to take, jure proprio, but also the share which their deceased parent, the common ancestor, would have taken, if alive. Thus, if a woman had two children by a former, and one by a present husband, and one of the two died intestate, his surviving brother of the whole blood, and'his mother, each being" entitled to double portions, would take two-fifths each, and the brother of the half-blood the remaining one-fifth; but if the mother were to die firsc, and then one of the two first children died intestate, the question would arise, whether, as before, the brother of the whole blood should take two-fifths in his own right, and one-fifth in right of his mother, whom he with his brother represented equally, and who, if alive, would have taken two-fifths, and the brother of the half-blood one-fifth, in his own right as before, and one-fifth in right of his mother; or whether, taking altogether in their own right, the brother of the whole blood should take two-thirds, and he of the half-blood one-third. And I do not see how the claim to represent the deceased mother could be resisted. It would, at least, have been a serious question : and such questions might be multiplied amongst the descendants of remote ancestors who were of the whole blood. To obviate these consequences, was I think, the chief object of the 14th section, and this was completely effected by the declaration, that female ancestors, and the children of deceased ancestors, male and female, in the same degree, (a general description which embraces the particular cases of mother, brothers and sisters, grandmother, uncles and aunts, provided for in the same clause,) should take per capita, that is, only in their own right, and not as representing a deceased common ancestor. This also precluded the descendants *of such children from claiming to represent any common ancestor; for, they claiming through all their ancestors in succession, as representing them immediately or mediately, when the representation reached the children of the deceased common ancestor, it must have stopped there, since these children were prohibited to claim any thing as representing any other. Thus the rule of representation, which would otherwise have been extended to the common ancestors as the stocks, at least in some cases, was, by this provision, effectually limited in its practical operation, according to its effect at the Common Daw, making the children of the common ancestors the stocks, in which the representation terminated in all cases.
There is in the terms of this section itself, an internal, and I think, conclusive proof, that the purpose which I attribute to it was the only object of that provision, so far as it directed the female ancestor living, and the children of deceased ancestors, male and female, in the same degree, to take per capita. This omits the case of the children of a living female ancestor coming into the partition with her alone, or with her and the children of deceased ancestors in the same degree. If that provision had any conceivable object, other than that which I attribute to it, there was precisely the same reason for embracing the children of living, as of deceased ancestors, in the same degree, since they were related to the intestate in the same degree and manner, to all intents and purposes. If it was intended to prescribe a rule of partition fo'r a particular case, or a general rule, by putting an example, to be applied to all analogous cases, upon the supposition, that no rule existed, independant of the Statute, in either case there was an absolute necessity, in order to avoid absurdity and confusion, to embrace the children of living, as well as of deceased ancestors, in the same degree, in that provision. This distinction between the children of living and deceased ancestors, was made designedly and ex industria. The Authors of the Statute, collecting all the *cases in which several might succeed together, and selecting from them particular persons, specify, in the very terms of the 2d. 4th and 7th sections, the cases of children, mother, brothers, sisters, and grand-mothers, uncles and aunts, and passing the 9th, (which designated the brothers and sisters of grand-fathers and grand-mothers.) because it fell within the general terms of the 10th section, adopt the language of the 10th, (which embraced all the former cases in its general terms, and embraced also the descendants of all ancestors in the same degree, living and dead,) with this exception, that the provision of the 14th section, whilst it embraces the children of the deceased, excludes those of the living female ancestors: which could not have been done without a motive, for otherwise it was natural, that they should have adopted the terms of the 10th section literally, as they did those of the 2d, 4th, and 7th, and embraced in the provisions of the 14th section the children of living, as well as of deceased ancestors. The weight of this observation is not implied by the circumstance, that the designation of brothers and sisters, and uncles and aunts, by those names, in fact embraced all the children of living, as well as of deceased fathers, mothers, grand-fathers and grandmothers. The omission of the children of living female ancestors, and including in terms the children of deceased ancestors, in the more general description of the persons intended to be embraced in the 14th section, is a clear proof that, although all brothers and sisters, and uncles and aunts, (the children of living, as well as of de *732 ceased ancestors,) were embraced in the terms of that section, none of them but such as were the children of deceased ancestors of the intestate, fell within the reason and objects of the provisions of the 14th section; and that to effect that object, whatever it was, it was not necessary to include the children of living ancestors. At the same time the fact, that in one part of this provision, the children of living, as well as of deceased ancestors, are included, and in another, those of living ancestors are excluded, *is a decisive proof, that it was immaterial to the object of that provision, whether the children of living ancestors were excluded, or included, whilst to include the children of deceased ancestors, was indispensably necessary to the attainment of that object. This was precisely the character of the object which I attribute to that provision, and which cannot be attributed to any other conceivable object whatever.
If the children of all ancestors in the same degree, living and dead, were included in this porvision, then, by force of this provision alone a representation to a common ancestor would be prohibited in all cases, without any reference to any principle of the Common Law. If the children of a living ancestor were excluded from the terms of this provision, then the Statute would prohibit a representation to a deceased common ancestor only; and in that case, the principles of the Common Law of descents would prohibit a representation to the living ancestors, since no one can represent and take the share of any one who is alive and can take it herself. This view of the provisions of the 14th section cannot be avoided by the supposition, that in no case could a child of a common ancestor come into the partition unless at least one of the common ancestors (the male) were dead. If a woman had two children by a first, and one by a second husband, and one of'the two were to die intestate, the surviving brother of the whole blood, the mother and the brother of the half-blood would succeed, although the latter would not be a child of any deceased ancestor of the intestate: and although this particular case is embraced in the terms of the 14th'section, yet cases might occur in which not one of those succeeding, would be the children of any deceased ancestor of the intestate, as if the only relations of the intestate were a great grand-mother, and her children, and'otber descendants, all of them of the half-blood; a case' totally unprovided for by this section. The word deceased being introduced for no other conceivable purpose, but to prohibit any claim by ^representation to a deceased common ancestor, and it not being necessary to introduce that word for that purpose, it could oniy be introduced because that object, occupying the mind of the Author of the Statute, he naturally expressed it distinctly, by using the word appropriate to that object; or he inserted it purposely to afford an infallible clue to the true object of that provision : and this, I am strongly disposed to think, was the true reason for the use of that word.
I confess, that the necessity which I felt to ascertain the true object of inserting this word, as well as of every other word in the Statute, led me to a course of reflection, which has changed my first opinion; for, following blindly, and without examination, the incautious and extra-judicial suggestion so often made, that our ancestors, in their extreme hostility to the Common Law of Descents, had abolished it in all its parts, root and branch, I at first thought, that the Statute not having provided in all cases for the proportions in which estates should descend, in such as were not provided for, all who came into the partition, were entitled to take equal shares, according to the rule in the construction of Deeds and Wills, and the Civil Law rule applied to the very case of the Laws regulating the succession to intes-tates’ estates. And this would certainly be the case, unless that construction was controuled by some pre-existing principle of the Common Law of Descents, or some provision of the Statue, or by both combined, the latter of which will, I think, be found to be the fact.
If the sole object of the 14th section had been that of prohibiting any claim by representation to a deceased common ancestor, that would have been fully effected by the declaration, that the children of <he deceased ancestors of the intestate, and a living .female ancestor, coming into the partition, should take per capita; that is, upon the supposition, that the Common Law principle of representation was in full force, since that would have supplied the rule, in case some of them were dead, and some were living, or *all dead; and that, precisely to the same effect as the rule prescribed by the Statute in particular cases. And if that object had been the only one, that part of the section which embraces the children of the intestate, and provides that if a part of those designated to take per capita be dead, and a part of them living, the issue of those dead should take per stirpes, would have been superfluous, and we are necessarily led to enquire, for what purpose those provisions were inserted: For the purpose, I think, and for that only, of prohibiting a construction of the clauses of the Statute designating the classes of persons to take (which we may term the donative clauses,) by which, all coming within the literal terms of those clauses, might be considered as entitled to take equal shares, and even children to take with their living parents; for the children of a living son or brother, are no less his descendants when he is alive, than after he is dead. The principle of the Common Law of Descents prohibited any ,one, whose intermediate ancestor (other than the common ancestor) was alive, from succeeding to an estate, or to claim otherwise than by representation, where any intermediate ancestor could by possibility have been capable of taking the inheritance if alive, (our Statute making one single exception even to that rule.) The literal terms of the Statute calling children and their descendants, brothers and sisters and their descendants, &c. to the succession, without distinction, might have been considered as abrogating these *733 principles of the Common Law, unless there were some provision in the Statute opposed to such a construction, and showing that these Common Law principles were in full force. To give a single example of a succession by representation in stirpes, in conformity with the principles of the Common Law, was sufficient for that purpose, and it was convenient to annex it to the provision declaring who should take per capita, which was accordingly done, and the example given is precisely in conformity with the effect of the Common Law principle of representation, making the children of the intestate, *or the children of his nearest ancestors, the stirpes, or stocks.
Here I think I might, and perhaps ought to cease, but the opinion of Judge Tucker, to which it is said the public opinion and practice have conformed', (although I have never heard of any case having actually occurred, except this,) has been so much urged as proper to govern our decision, that it may not be amiss to examine it. He lays it down as a general rule, as to which he does not seem to have imagined there could be any doubt, that “where several persons succeed at the same time in equal degree, they shall take per capita, but if a part be more remote than others, those more remote shall succeed in stirpes.” And he puts the case of six grand-children, by different deceased children in unequal numbers, and says they would take per capita; and this he says, is in conformity to the Civil Law. And in a note to Blackstone’s Commentaries, where the author states the case in the Civil Law, of nephews and nieces succeeding alone, and taking per capita, or if with brothers and sisters in stirpes, he states, that this is in conformity with the rule established by our Statute, and cites the terms of the 14th section verbatim, without comment, as if it clearly established that rule in terms. He no where assigns any reason for this construction, as he certainly would have done, if the question, as now presented, had occurred to his mind. It seems to me, that having satisfied himself that our Statute intended to abolish the Common Law of Descents in omnibus, which he labors to prove, by pointing out the many discrepancies between our Statute and the Common Law; and believing that the Civil Law rule was such as he states ours to be, both in lineal and collateral successions, an impression readily enough taken from the careless manner in which Blackstone states the rule of the Civil Law in both respects; and considering the words “children of his deceased ancestors,” in the 14th section, as meaning all their descendants, as it sometimes does, both in the Civil and '’'Common Law, and the words “male and female, in the same degree,” as referring to those who came into the inheritance, (an impression very natural to one whose attention was not particularly excited to the examination of those phrases,) Judge Tucker, hastily and without perceiving that any question could be raised upon the subject, concluded, that the Legislature intended to substitute the Civil Law of Succession, for the Common Law of Descents. ' In every one of these opinions, I think, Judge Tucker was clearly mistaken. As to the terms of the Statute: if they could be understood, as he probably understood them, they would indeed establish his rule. But, the word “children,” in the 14th, was used in opposition to “descendants,” in the 10th section, and mean children in the most restricted sense of the word; and the words “male and female, in the same degree,” refer to the deceased ancestors, whose children might come into the partition, and not to those who came into the partition. To suggest these constructions is, to insure an assent to them.
As to the question, whether it was intended to abolish, in toto, the Common Law of Descents, enough has already been said. The construction given by Judge Tucker to our Statute, by which grand-children (all the children being dead) would succeed per capita, is clearly in opposition to the Civil Law, the Statute of Distributions, and the Common Law, all of which concur in this particular, and in principle in this particular only, although in a few cases amongst collaterals, the opposite principles of the Civil Law, and Statute of Distributions conforming to it, and the Common Law of Descents, produce the same practical effects, as lines drawn at right angles to each other meet at a single point. Nor does Judge Tucker’s rule conform, either in principle, or effect, with that of the Civil Law, and Statute of Distributions, in respect to the succession of ascendants, or collaterals, as has been already sufficiently shown. Nor is there the slightest intimation to be found in the provisions, or phraseology of our Statute of Descents ^indicating an intention to> adopt any single principle of the Civil Law, or of the Statute of Distributions: the latter selecting the distributees according to their personal proximity, without regard to the proximity of their ancestors ; the former selecting the heirs according to the Common Law rule, founded wholly upon the principle of unlimited representation, on account of the proximity of the Common ancestor, without regard to their individual proximity: the Civil Law and Statute of Distributions allowing of no representation amongst collaterals, except in a single, and very particular case, the Statute allowing it in all cases, or at least, as Judge Tucker himself admits, in all cases where persons in unequal degrees succeed ; a case which could not happen in the Civil Law amongst collaterals, except in the single case alluded to; the nearest in degree in all other cases, absolutely excluding the more remote. Our Statute speaks of estates of inheritance descending in par-cenary to the kindred of the intestate, heirs inheriting, and ancestors transmitting inheritance: the Statute of Distribution speaks of children, and those who legally represent them, and of a distribution equally amongst the next of kin in equal degree; than which, no two things can be more different. In short, Judge Tucker’s rule does not agree with the principles of any system of laws ever existing in the world, so far as we are informed, either in respect to the distribution of personal, *734 or the descent of real estate. I repeat, that I cannot believe that the authors of our Statute intended to establish a new, and hitherto unheard of rule of descent and distribution, proceeding- upon no uniform principle, and varying the interests of the successors to intestates’ estates indefinitely, according to accidental circumstances; and especially, I cannot conceive that they could have intended to establish such a principle by the strange expedient of giving an equivocal example, from which no general rule can be possibly adduced, with any degree of confidence.
*The Decree should be reversed, and the estate divided in stirpes, considering the deceased brother and sister of the intestate as the ultimate stocks.
JUDGE COALTER.
The Legislature, in framing the Statute of Descents, seem to have pursued the policy of the Civil Law, in applying the same provisions to the descent of lands, and the distribution of personal property.
Our course of distributing the personal subject, and that- of Great Britain, were nearly the same; both conforming, in a great degree, to the Civil Law. In England though, and in this country before the Revolution, the principles of the Feudal System, engrafted on our Laws, made it impossible that lands should go as personals. In fact, the course of descents, as regulated by Federal principles, had been established long before there was any Statute for thé distribution of personal property.
The principles of our Revolution, though, required that those Feudal doctrines of primogeniture, preference of males over females, that lands should not lineally ascend, the rules as to the half-blood, and the blood of the first purchaser, &c., should be done away, and that the course of descents should conform to this new state of things. In other words, that the realty and personalty should go together to the same persons, and that both should go, not according to the former course of descents of lands, but (with some modifications,) according to the former course of distribution of personals, pursuing the supposed preference, arising from natural affection. Had the Legislature simply provided, that lands should thereafter descend to the samel persons, who would have been entitled to them, if it was personal property, according to the Statute of Distributions, it would have been a Statute of Descents in all respects, perfectly suited to our new political existence, and one, in all its essential attributes, very similar to the ^Statute that was passed. Hence I conclude, that that Statute was drawn very much from our Statute of Distributions, the Civil Law, and the decisions of Courts on that subject, and being diametrically in conflict with almost every principle of the Common Law, founded on the Feudal System in relation to descents, it was entirely to repeal or abrogate that Law on this subject. This seems to have been Judge Tucker’s opinion, in his commentary on this Statute, as well as the opinion of this Court, expressed in the case of Browne v. Turberville, 2 Call, 390. It seems to be admitted, that the case before us, if not a casus omissus, is not expressly provided for by the Statute; and the consequence is, that we must either consider the case as one to which we cannot extend the Statute, and must, therefore, determine it according to some pre-existing Law, remaining still in force; or, we must bring it within the equity and meaning of the Statute, by extending the positive provisions therein found, in regard to like cases, to the one before us. -
This is a case for the partition of real, and the distribution of personal estate of an intestate; and if it cannot be decided under the Statute, what antecedent Law is to regulate us in disposing of these two •subjects?
Our Statute of Distributions is now a very short one. 1st vol. V. L< p. 382. It is to be found, originally in the Act of 1785, and now in the 29th section of the present Statute of Wills, Intestacy and Distributions, which, after providing for the wife, declares, “That the surplus shall be distributed in the same proportions, and to the same persons, as lands are directed to descend, in and by an Act of the General Assembly, entitled, “An Act to reduce into one the several Acts, directing the Course of Descents.’’ Tf that Act, though, does not provide for the case, either expressly, or by proper construction, and if we are to look to antecedent Laws, either as to the persons to take, or the proportions in which they are to take, to what must we look? It seems to me, we cannot look *to the. Common Law as to the personal subject; for, that never regulated the distribution of personal estates. If that Law, therefore, is still in force, and applies to the real subject now before us, and will be the rule of decision as to it, still it seems to me, we cannot look to it as to the personality; fot, it is to go with the land only, where'it can go to the same persons, and in the same proportions, as lands are to go under the Act. If we cannot ascertain by the Act, as well the persons, as the proportions in which they are to take, but must look to the Common Law for either, the provision in the Law, as to the personality, seems to fail. If we should even find, by looking into the pre-existing-Statutes of Distributions, and applying them to this case, that they would carry the personalty to the same persons, and in the same proportions, as the Common Law would carry the reality, still it would not, I apprehend, be the Common Law that would give the rule, but the former Statutes of Distributions, if we consider them as so far unrepealed. But, should it be found, that the Statute of Distributions would carry the personalty to different persons, or in different proportions, then we must sever the personalty from the realty, or apply the Common Law rule to the personalty. It is true, there is a very apparent intention in the Legislature, that the realty and personalty should, in all cases, go together to the same persons, and in the same proportions; but, that is evidently also under the idea, that every case was provided for by the Statute. Had it been suggested to the Legislature, that possibly some cases were not provided for, and there *735 had been a general clause framed for the purpose or designating what pre-existing Law should give the rule in such cases, what would they have said? It seems to me, they would have said, as the Statute had broken up the whole foundation of the Common Law in this respect, and had, in all its essential features, adopted the Statutes and decisions on the subject of Distributions, that in all omitted cases, or cases of doubt, the great policy *of the Statute should be pursued, and those laws and decisions adhered to, rather than , the exploded Common Law rules, with their feudal origin.
But, there is no such clause expressly directing us the one way or the other. On the contrary, the Legislature believed they had provided for every case that could arise; and it seems to me, that this is so apparent, that we cannot resist the conclusion, that as well the Common Law as the Statutes of Distribution, were considered as entirely abrogated ; and it therefore becomes our duty, if that can be done on any fair principle of construction, to extend the Act to the case before us.
Before going into this enquiry, however, let us attend a little more minutely to the Common Law course of Descents, as contrasted with that of the Civil Law, from which latter the Statute of Distributions, and the Act under consideration, have been drawn.
The first Common Law rule of Descents is, ;‘That inheritances shall lineally descend to the issue of the person who last died actually seised, in infinitum, but shall never lineally ascend.” 2 Bl. Com. 208. This is contrary to the Civil Law; was founded on feudal principles, and is entirely altered by our Law.
A second general Rule or Canon is, “That the male issue shall be admitted before the female.” 2 Bl. Com. 212, 213. This is contrary to the Civil Law, and is absolutely put an end to by our Statute.
Thirdly, “Where there are two or more males, in equal degree, the eldest only shall inherit; but the females altogether.” Ib. 214. This rule of primogeniture was also against the Roman Law, and is abrogated by our Statute.
If then, in any case, we are obliged to resort to the Common Law for the rule, we cannot decide the case still, according to the Common Law; for, we must pay no attention to these Rules or Canons, but must in fact, so far decide the case, as if no such Rules or Canons had ever existed. But, these Rules or Canons have had a most important ^effect on the doctrines of the jus representationis of the Common Law, so as to make it what it never would have been, but for those Canons. And hence a great difficulty has arisen in my mind, in considering how we can decide what the Common Law rule of jus representationis is, when we are bound to strip it of those very Rules and Canons, which gave it its present form and shape. In other words, our Legislature have abrogated the Common Law, in the three particulars aforesaid, the existence of which in England had caused certain rules to be established in relation to the jus representionis, which would not otherwise have existed, and yet we are to consider the Common Law jus representationis, as applicable to this country, and still in force in cases not expressly provided for by our Statute. On the contrary, I feel irresistibly led to conclude, that our Legislature, having abrogated the reasons why the jus represetationis of the Common Law was made to differ from the jus representationis of the Civil Law, and which would have been the Law of England too, but for those reasons, the whole must be considered as abrogated. The reason of the Law is the life of the Law. It is not usual to repeal the Common Law as you do Statutes; but, where a principle is introduced in conflict with the reason on which it is founded, it must be considered as altered; otherwise, a Law must exist after its life is extinguished. Let us see how the Common Law rule of representation came tobe what it is. A fourth Canon of Descents is, “That the lineal descendants, in infinitum, of any person deceased, shall represent their ancestor; that is, shall stand in the same place that the person himself would have done, had he been living.” 2 Bl. Com. 216. Thus, the child, grand-child, or great grand-child, (male or female) of the eldest son succeeds before the youngest son, and so in infinitum. And these representatives take neither more nor less, but just so much as their principles would have done. As, if there be two sisters, M. and C.; and M. dies leaving six daughters; and then *John Stiles, the father of the two sisters, dies, without other issue : these six daughters will take among them exactly the same their mother would have done, had she tjeen living; that is, a moiety of the land in coparcenary. This taking by representa^ tion, is called succession in stirpes, according to the roots, since all the branches inherit the same share that their root, whom they represent, would have done. This Blackstone says, is different from the Roman Law. In the descending line, he says, the right of representation continued in infinitum, and the inheritance still descended in stirpes: as, if one of three daughters died, leaving ten children; and then the father died, the two suriving daughters had each one third, and the ten grand-children one third between them. And so among collaterals. If any person in equal degree with the person represented, were still subsisting, (as if the deceased left one brother and two nephews, the son of another brother,) the succession was still guided by the roots; but, if both the brethren were dead, leaving issue, then (I apprehend, he says,) their representatives, in equal degree, became themselves principals, and shared per capita, they being now themselves in the next degree to their ancestor in their own right, and not by right of representation ; whereas, he says, the Law of England would only divide it into two parts, giving one part to each set of children, however unequal in numbers.
This mode of representations, he says, is a necessary consequence of the double preference given by our Law, first, to the *736 male issue, and next, to the first born among the males; to both of which the Roman Law is a stranger. Por, if ail the children of three sisters were in England to claim per capita, in their own right, as next of kin, without respect to the stocks, and those children were partly male and partly female, then the eldest male among them would exclude not only his own brethren and sisters, but all the issue of the other two daughters; whereas, by dividing the inheritance according to the stocks, the rule of ^descents is kept uniform. The issue of an eldest son excludes all, as the son himself would, if living: but the issue of two daugters divide the inheritance between them, provided their mothers (if living,) would have done so, and among these several issues, or representatives, the same preference of males and of primogeniture prevails.
This preference given to males, and this Common Law rule of primogeniture, made it necessary then to vary the jus r'epre-sentationis as to real estates, from what it was by the Civil Law, and as applicable to personal estates, by the Statute of Distributions ; but, as this reason for the variance is done away by our Act; and as that Act., when we come to examine it, I think will be found to provide for a succession in capita, where the parties to take are classed in the same degree, and only resorts to the right of representation where some of them are dead, leaving issue, and some living, I cannot perceive how it is, that such essential changes in our Law, affecting the very reason in which the variance in the Common Law right of representation, from the Civil Law right, is founded, shall nevertheless be considered as leaving that Common Law rule in full force.
. The case before us, is one of collateral kindred, the children of a brother and sister; and if it had been a case of the distribution of personalty only, and the Act of Descents never had passed, but the case had been decided on the Statute of Distributions, either in England or here, those in equal degree would have taken equal portions. This is decided, as I understand; in the case of Walsh v. Walsh, Prec. in Ch. 54; that is to say, the children of brothers and sisters alive, would take the whole per capita, in exclusion of the issue of any child of a child of a brother or sister who should be dead, leaving issue. This was decided in Pett’s Case, 1 P. Wms. 25: See also, Carter v. Crawley, Sir Thomas Raymond, 496; the Statute of Distributions prohibiting representation beyond brothers’ and sisters’ children. Whether, or how far this is changed by our Statute *of Descents, either expressly or by sound construction, is the question before us. But, in such case, had the subject been realty the course of descents in England by the Common Law would have been very different, as we have before seen.
But, suppose it had been a case in the direct descending line, and a case of personalty, and decided in England, under the Statute of Distributions; and the case was one between children of children, the parents being all dead, how would it be decided?
In the Notes on Justinian, by Cooper, page 394, I find these observations on 118th Novel: “The three first chapters of this Novel,” says he, “deserve the attentive consideration of the reader, not only because they contain the latest policy of the Civil Law, in regard to the disposition of the estates of intestates; but because they are the foundation of our Statute Law in this respect.” He refers to Holt’s Cases, 259, 1 P. Wms. 27; Prec. in Ch. 593, and Sir Thomas Raymond, 496. And he says, “They are still almost of continual use, by being the general guide of the Courts of England, which hold cognizance of distributions, in all those cases in which our own Laws have either been silent, or not sufficiently express.” Speaking of the succession per stirpes, he says, “Nothing is more clear in the Civil Law, than that grand-children even when alone, (although they descend from various stocks, and are unequal in their numbers,) would take the estate of their deceased grand-father per stirpes, and not per capita. Suppose therefore, that-Titius should die, leaving grand-children by three different sons already dead; to wit, three by one son, six by another, and twelve by another; each of these classes of grand-children would take a third of the estate, without any regard to the inequality of the numbers in each class. But, as to this point in England, the Law. Reports mention no judicial determination; yet it seems probable, that the Courts, in which distributions are cognizable, would order the division of an estate in such a case to be made *per capita; and this, partly from a motive of equity, and partly from a consideration of the intent of the Statute, relating to the estates of intestates: for, the Statute directs an equal and just distribution, and, when the Act mentions representation, it must be understood to refer to it, in those cases only, where representation is necessary to prevent exclusion, but not to refer to it, in those cases, where all the claimants are in equal degree, and therefore can take suo quisque jure, each in his own right.”
In a subsequent part of of his Notes, (page 546,) he refers to Dr. Taylor’s Civil Law, and gives an extract therefrom, in which, (page 551,) it is laid down: 1st. That brothers and sisters alone, of the whole blood, succeed in capita, to the exclusion of the half-blood. 2d. Brothers’ and sisters’ children, concurring with brothers and sisters, succeed in stirpes. 3dly. Nephews alone succeed in capita, none-in stirpes: for the succeed (now) in-their own right, and not by representation. This I understand to be our Law, with the further provision to be deduced from it-, that if any of them be dead, leaving, issue, that issue is to come in or concur with, those alive who are in equal degree, but per stirpes.
In England, there was no policy, in regard to the support of their aristocracy, requiring that the personal estate should go as the real, and so they adopted the Roman Law in distributing it; and it is believed by this able writer, that though there is no adjudged case to that effect, *737 that the sound construction of the Statute would lead the Courts to explode even the Civil Law doctrine of representation, except where it is necessarily resorted to, to prevent exclusion. But our Statute, so far as it expressly speaks, seems to adopt precisely that course. We have no aristocracy to support, no principle of policy which would require, that in any event the realty and personalty shall go in different ways. On the contrary, the great policy of the Statute evidently is, to seek in the ascending line, and in every direction, those for whom a supposed preference, arising from natural affection, might exist, and to give the '*whole estate real and personal, to tbern. It forms them into classes, and where a class consists of more than one, and all are alive, they take per capita; if any are dead, leaving issue, which if it were not in the class, would be excluded, the principle of representation is, in such cases, and only in such cases, resorted to.
The great and leading policy of the Statute, it seems to me, is the polar star in this enquiry, and if steadily kept in view, will lead us to a sound and consistent construction of the Act, and will cover every possible case under it.
The Statute on which I shall make my observations, is that which is found in the first volume of the Revised Code of 1819, page 355, which is the same as to the subject before us, with the Law as it stands in the Revised Code of 1794, but in which there is some transposition of sections.
1st. The first section provides that the inheritance of an intestate shall descend and pass in parcenary to his kindred, male and female, in the following course:
It shall go in parcenary, not subject to all the incidents of estates in parcenary at the Common Law; for there, if one of two or more daughters is dead, leaving sons and daughters, the eldest son of such daughter would take per stirpes with the surviving daughters. I would, therefore, construe the word parcenary to mean in equal shares, as contradistinguished for tenants in common, and joint tenants. It is to descend then in equal shares to his kindred; what kindred? Not to those in equal degree of consanguinity, though that is a very governing principle in arranging the classes, but according to the classes or course fixed by this Law. That is to say:
2d. “To his children, or their descendants, if any there be.” Coupling this svith the sixteenth section, the intention of the Legislature was: That if all the children were alive whether male or female, they should take equal shares, per capita; but if any child was dead, leaving descendants, those descendants are to take by virtue of the ^second section, and however numerous, would take per capita, and equally with the children, for they are in the same class with them, but for the operation of the sixteenth section, which provides, that where the issue of those children which are dead, come into partition with the living children, they shall take per stirpes, the share of their deceased parent.
But, suppose A. dies intestate, his children B. and C. having died before him, B. having left three children, and C. six, and all these children are alive; how does the estate go? These are descendants of the children of the intestate. They are expressly named in the second class, and by the first section, are to take equally, unless, as in this other case, the sixteenth section provides otherwise; but there is no provision at all there, for they are all equal, and can each take in his own right, and none are excluded. But, suppose one of the children of B. is dead, leaving eight children, these are descendants of the chiid of the intestate, and are expressly called to the inheritance, by the second section, and they must take per capita, unless they can be brought within the influence of the sixteenth section; they cannot be excluded altogether, nor can you refer them to the rules either of the Common or Civil Law. They stand under the express words of our Statute, as inheriting equally with the eight surviving children of B. and C., and must each take one-sixteenth part of the estate, under the first and second sections, unless you can bring them within the sixteenth section, and so we may go on and suppose a thousand cases in the descending line; as if all the children of B. and C. had been dead, all leaving children, and ail alive, or many of them dead, leaving children, &c. You cannot send them to the Common or Civil Law rule of representation. By the express provision of the first and second clauses, they being all descendants of children, are placed in the second class, and are to take equally, unless there is something in the Law which expressly, or by sound construction, directs otherwise.
*My opinion is. that we ought to apply the great principle of the 16th section to the case, to wit, that where some in equal degree are dead, leaving issue, which issue are to come into partition with those alive, they shall take per stirpes. It is true, that I do not resort to the principle of representation here, in order to prevent the exclusion of such issue, because they are expressly included in the Law, but I resort to it, in fixing the share they are to take, so as not to counteract the great principle of seeking for all those who would be supposed to be the nearest objects of affection, and to give it in proportion to such supposed predilections, and in the proportions pointed out by this Act in similar cases. This, though, is equally a case omitted, or rather not expressly provided for by our Statute, with that before us, and we have no means of applying any just rule to it, except by extending the 16th section to it.
3d. “If there be no children, or their descendants, then to the father.”
4th. If there be no father, then to his mother, brothers and sisters, and their descendants, or such of them as there be.” Whose descendants? Not those of the mother, by an after-marriage. They would be brothers and sisters of the half-blood, subject to the rules as to the half-blood ; but descendants of brothers and sisters. There is no mother, though, nor brothers nor sisters, but there was a brother *738 and a sister, who are dead, the sister having left four children, and the brother one. These, say, are all alive at the death of the intestate. They are descendants of a brother and sister, they are expressly called to the inheritance by the fourth section, and, according to the first section, they are to take equal shares, unless something in the Law prevents. The sixteenth section, though, makes no provision for a succession amongst these parties, per stirpes. There was no necessity; they are all descendants, and stand under the Act by that description, and are entitled to the inheritance, and they are moreover all in equal degree of consanguinity, and it is to be presumed, ^equally in the affections of the intestate. They will take equally. So far, it seems to me, as to such persons, there is no omission in the Statute. But, it turns out, that two of the children of the sister are dead, leaving issue, unequal in numbers, but amounting in all to eight. These are descendants of a sister, and expressly called to the inheritance, and must take per capita, (unless we can apply the sixteenth section to them,) with the other descendants. We can no more in this case, than in the otner, as it seems to me, refer them, either to the Common or Civil Law. They stand, in the words of our own Statute, and the only question is, whether a sound interpretation of the whole Law will enable us to say, that they should take per stirpes? It seems to me, for the reasons above suggested, as to the other case put, that we can and ought to do so.
This is the more desirable, if it will, as we are told it will, be consonant to the doctrines heretofore generally understood and acted on.
This will be the safe course. Nothing that has heretofore taken place, will be unsettled. We cannot act prospectively, as the Legislature can; we may unsettle many estates long since settled. The Legislature, if we err in the construction, can put us right, which, acting prospectively, can do no injury. The real and personal estate can go together under the same Law, as was intended, and this will be agreeable to the great principles of the Act above noticed.
If we do not do this, but resort to the Common Law jus representationis, to ascertain the proporions, what are we to do with the personal subject in this case? If we give it to the same persons directed by the Statute, still we cannot give it in the proportions directed by the Statute; for, we look not to the Statute, but to the Common Law, for these proportions. They are different in this case, from what the proportions were according to the Statute of Distributions; and we must then do violence to *the Act, either by expounding it to mean, that the personal subject shall go to the same persons, and in the same proportions, to whom the land goes, whether the proportions are fixed by the Statute, or by the Common Law; or, we must consider the Statute of Distributions also, so far, as uurepealed, and vary the proportions, or we must consider it as repealed, and that the case is one not within the present Statute, and consequently, that'no distribution can be made. I think my construction most consistent with the true intention of the Legislature, and that the Decree must be affirmed.
JUDGE CABELL.
This is a controversy about the division of the estate of Anthony Gardner, who died intestate, without issue, without father, and without mother, brother, or sister, living at the time of his death. He had had a brother and a sister, but both of them had died before him, leaving issue; and it is among the descendants of his brother and sister, that his estate must be divided. The brother left an only child, E. M. Davis, the Appellant: the sister left two sons, living at the death of Anthony Gardner; two grand-children by one deceased daughter, and six grand-children by another deceased daughter. It thus appears, that the relations of the intestate, who were to inherit his estate, were one niece on the part of his brother, two nephews on the part of his sister, and the children of two deceased nieces on the part of his sister. No question can possibly be made as to the right of any of these relations to participate in the inheritance; for, being descendants of a brother and of a sister, they are called to the inheritance by the express words of the fourth section of out Act of Assembly directing the course of descents. But, the question is, as to the portions in which they are to participate. It was not pretended by any of them, that the estate was to be divided among them all equally, share and share alike. It *was on the other hand contended by the Appellant, that the intestate, having had only one brother and one sister, both of whom died before him, leaving issue, the estate was to be divided into moieties; one of which she claimed for herself, as the only representative of her deceased father, the brother of the intestate; leaving the other moiety to be assigned to the descendants of the sister of the intestate, as representing her. The Chancellor, however, decided, that the estate should, in the first place, be divided into five parts, according to the original number of the nephews and nieces of the intestate, and that one of these parts should be assigned to the Appellant; one to each of the nephews on the part of the sister; one to the descendants of one of the deceased nieces; and the other to the descendants of the other deceased niece. And the question is, as to the propriety of this decision.
This is a very important question; and this is the first occasion on which the Courts have been called on to decide it. Such a question could hardly have arisen before the first of January, 1787; for, until that time, the Common Law, regulating the descent of real estate, and the Statute of Distributions regulating the distribution of personal, were too plain to admit of doubt. But, the Common Law paid but little regard to the supposed preference of the intestate, founded on natural affection, and was influenced, almost exclusively, by certain political considerations, which, although well suited to the Government of *739 England, were unnecessary to, or inconsistent with, the Republican Institutions which we had established. A change in the course of descents took place, as a necessary consequence of our change of Government. This change was effected by the Act of 1785, ch. 60, which went into operation on the first of January, 1787. This Act paid a due regard to the dictates of natural affection, and avoided the aristo-cratical tendencies of the former system. It accordingly abolished the preference which had been given to males over females. It abolished all preference on account *of primogeniture or seniority. It paid no regard to the blood of the first purchaser; and it called to the inheritance relations in the ascending line, and relations of the half-blood. But, the most important of these changes were effected not so much by laying down general principles or Canons of Descent, as by stating particular classes of persons who should inherit. Thus the Act directs:
1. That henceforth, when any person having title to any real estate of inheritance, shall die intestate as to such estate, it shall descend, and pass in parcenary to his kindred, male and female, in the following course; that is to say:
2. To his children, or their descendants, if any there be:
3. If there be no children, nor their descendants, then to his father:
4. If there be no father, then to his mother, brothers and sisters and their descendants, or such of them as there be:
5. If there be no mother, nor brother, nor sister, nor their descendants, then the inheritance shall be divided into two moieties; one of which shall go to the paternal, the other to the maternal kindred, in the following course, that is to say:
6. First to the grand-father:
7. If there be no grand-father, then to the grand-mother, uncles and aunts, on the same side, and their descendants, or such of them as there be:
8. If there be no grand-mother, uncle nor aunt, nor their descendants, then to the great grand-fathers, or great grand-father, if there be but one:
9. If there be no great grand-father, then to the great grand-mothers, or great grandmother, if there be but one, and the brothers •and sisters of the grand-fathers and grandmothers, and their descendants, or such of them as there be:
10. And so on in other cases, without end; passing to the nearest lineal male ancestors, and for want of them, to the lineal female ancestors, in the same degree, and the ^descendants of such male and female lineal ancestors, or to such of them as there be:
Then follows a section, declaring that none shall inherit, except children of the intestate, unless in being at the intestate’s death.
The next section provides, that if there be no paternal kindred, the whole shall go to the maternal; if no maternal, the whole shall go to the paternal: if none of either, the whole to go to the wife or husband; and if the wife or husband be dead, it shall go to her or his kindred, in like course as if such wife or husband had survived the intestate, and then died entitled to the estate.
The next section designates the manner in which the whole and half-blood shall take.
There are some other provisions, which will be hereafter noticed for a special purpose.
These details are so minute, and at the same time so comprehensive, that it is believed to be impossible to conceive a case of intestacy, that is not expressly provided for by the Act, so far as relates to the persons, or classes of persons, who are to inherit. As to the persons, or classes of persons, therefore, who are to inherit, it may be justly inferred that the Legislature intended to provide by the Act of 1785, a complete and perfect system, so as to render unnecessary and improper, a reference to any other Code or System of Laws whatever. And as there was no longer any good reason why the distribution of personal, should be different from the descent of real estate, the same Legislature, by a subsequent Act, declared that the personal estate, after payment of debts, and provision for the wife, shall be distributed in the same proportions, and to the same persons, as lands are directed to descend in and by the Act directing the course of descents.
But, although the course of descents of real, and the distribution of personal estate, is rendered thus full, complete and perfect, as to those persons who shall be the distributees of the one, and the heirs of the other, yet it is ^manifest that the provisions of the Act are not equally full, complete and perfect, as to the proportions in which the estate is to be divided among those who are called to its participation. The express provisions of the Act, so far as relates to this subject, are far from embracing all the cases which may occur. The only part of the Act which expressly relates to this subject, is the 14th section of the Act of 1785, answering to the 16th section of our present Law. It is in these words: “And, where the children of the intestate, or his mother, brothers and sisters, or his grand-mother, uncles and aunts, or any of his female lineal ancestors living, with the children of his deceased lineal ancestors, male and female in the same degree, come into the partition, they shall take per capita ; that is to say, by persons; and where, a part of them being dead, and a part living, the issue of those dead have right to partition, such issue shall take per stirpes, or by stocks, that is to say, the shares of their deceased parent.” It is perfectly clear, that this section does not provide expressly for the case now before us; nor does it provide expressly for any case where all the persons of any particular class designated in any of the previous sections, are dead, and the estate is claimed by their descendants. It does not provide, for example, for the case where all the children of the intestate are dead, some of them leaving descendants; nor where the mother, brothers and sisters are all dead, some of them leaving descend *740 ants; nor where the grand-mother, uncles and aunts, are all dead, some of them leaving descendants; nor to the case where any other female lineal ancestors, and the children of deceased lineal ancestors, male and female, in the same degree, are all dead, some of them leaving descendants: and it leaves such cases unprovided for, whether the descendants stand in equal or in unequal degrees of kindred to the intestate. There is not only a failure in the Statute to provide expressly for such cases; but there is no principle laid down, which will give a • general rule. It cannot be maintained, I think, that equality, or ^sameness of degree of kindred to the intestate, is to be the ruling principle; for, in the first place, there is nothing said in the Statute, about the degree of kindred of those who are to take, in relation to the intestate; and in the next place, all the cases of equal division specified in the Statute, save one, are cases where the persons taking the estate, do not stand in equal degree of kindred to the intestate. Thus, the mother, brothers and sisters, the grand-mother, uncles and aunts, &c. &c., when all alive, divide the inheritance equally, although they do not all stand in equal degrees of kindred to the intestate.
If the great and wise men who framed our Statute of Descents, had intended to lay down in the Statute itself, a general rule, or a principle furnishing a general rule, for regulating the proportions in which an estate is to be divided among the different heirs, they would have effected their object in terms precise, yet comprehensive so as to admit of no question ; as they had done in other parts of the same Statute, in relation to the persons, or classes of persons, who are to inherit. But, are we to suppose that they intended to leave us without any general rule on this important subject, because none is laid down in the Statute. Such a supposition is too disparaging to them, to be entertained even for a moment. On the contrary, the absence of a general rule, in the Statute, is proof conclusive to my mind, that the cases not provided for in the Statute, were considered as being provided for by the Common Law; a law, which all must admit to be in force, unless it has been abrogated by some Statute.
If the Common Law be in force, it contains a principle, familiar to us all, that will remove every difficulty, and solve every question that can possibly arise concerning the question in controversy. That principle is, “that the lineal descendants, in infinitum, of any person deceased, shall represent their ancestor: that is, shall stand in the same place as the person himself would have done, had he been living.” 2 Bl. Com. 216. Let us apply this principle *to this case, in order to test its operation. If the brother and sister of Anthony Gardner had survived him, they would have shared his estate equally, by the 4th section of the Act. But both to them being dead, leaving descendants, those descendants will represent their respective parents; that is, will stand in the same place as they would have done, I had they been living. One half of the estate, therefore, would be assigned to the descendants of the brother, and one half to the descendants of the sister. And in making the subdivision among the descendants of the brother and of the sister, if it should happen that any of them shall have died, leaving descendants, these last will also represent their parent, by standing in the same place as he would have done had he been living; for, the principle of representation, extends in infinitum. Thus the Appellant, E. M. Davis, the sole descendant of the brother, and representing him, would be entitled to the full moiety which her father would have taken, had he been living. The descendants of the sisters representing her, would take among them, the moiety that the sister herself would have taken, had she been living. But, as some of these descendants of the sister were dead, leaving children, who would represent their parents, the moiety which would have gone to the sister, had she been living, would be divided into four parts, according to the original number of her children, one of which would go to each of her two surviving children, and as to the other two parts, one of them would be divided equally among the children of one of her deceased daughters, and the other among the children of her other deceased daughter.
But the question still recurs, has this Common Law principle of representation been repealed? I have admitted that the Legislature intended to provide, by the Statute, a full, complete, and perfect system, so far as relates to the designation of the persons who were to inherit: and I believe that there never was any human intention carried into more complete and perfect execution. But, while they intended to abrogate the Common Law entirely, as *to the persons who are to inherit, where is the evidence of any intention that these-persons shall inherit on principles of descent different from those which prevailed at the Common Law. If this lagt intention had been entertained by the Legislature, why did they not give unequivocal evidence of it, as they did in relation to the other intention? If they had intended to do away the ancient and well established Common Law principles of descent, upon points other than those relating to the designation of the persons who are to inherit, they would have declared the new principles which they intended to substitute for the old. But there is no such declaration, except in a few instances, which I will hereafter notice. Whilst there is the utmost possible minuteness in designating the persons, or classes of persons, who are to inherit, the principles on which these persons are to inherit, are only to be gathered from the general expressions in the first section of the Act, that the estate shall descend and pass in parcenary, to his kindred, male and female. These expressions do not give the principles directly, but they do it indirectly, by necessarily referring us to the Common Law, to which they belong, and to which they are familiar, for an explanation of the principles of descent, and of *741 the nature, qualities, and incidents of an estate in parcenary. That this was the intention of the Legislature, seems obvious from other parts of the Act; for wherever they intended to change any of the Common Law principles of descent, provisions precisely commensurate to the object, are expressly introduced. As proof of this, I refer to the clause declaring that. ‘ ‘no right in the inheritance shall accrue to any person whatever, other than to children of the intestate, unless they be in being, and capable in Law to take as heirs, at the time of-the intestate’s death;” and to the •clause declaring that “bastards shall be capable of inheriting or of transmitting inheritance on the part of their mothers.” These two clauses relate to well known ■Common Law principles of descent, which it was not intended to change entirely, *but only to modify ; and these principles are still left to their Common Law operation, except so far as they are modified by these clauses. Where it was intended entirely to reverse a Common Law principle of descent, the Legislature have done it in terms well calculated to produce that effect: as, in the clause declaring that “in making title by descent, it shall be no bar to a demandant, that any ancestor, through whom he derives his descent from the intestate, is or hath been an alien.” Had it not been for this clause, the alienage of an intermediate ancestor would still have remained a bar, as at the Common Law. And this proves that the Act of 1785, was not intended to abrogate the whole Common Law on the subject of •descents; for, if a total abrogation was intended, where was the necessity of negativing particular parts only?
Judge Pendleton’s opinion in Browne v. Turberviiie, 2 Call, 390, is strongly relied •on by those who advocate the total abrogation of the Common Law. No man is more disposed than I am, to respect the opinion of that great Judge. But his opinions, like the opinions of all other Judges, must be considered in reference to the questions that are presented to them judicially. When they go beyond the very point that is presented by the case they are called on to decide, they are extra-judicial, and cease to be authority. The question in Browne v. Turberviiie, had no reference whatever to the Common Law principle of representation. It was a question as to the persons who should inherit; and it was contended in that case, that it was the •Common Law, and not the Act of Assembly that should determine the person who should be the heir. In deciding this question, he said, that “the Act of 1785, has totally done away the Common Law, as to the course of descents;” and that under that Act “no possible case, not provided for, can happen, so as to let in the rule of the Common Law.” He also says, “the rights of primogeniture arc wholly abolished, and wherever there are more persons than one, of equal degree of kindred to the intestate, *they share equally in the succession. ” But this last observation of Judge Pendleton, so far as it would seem to estab’ish a rule, that •equality of degree of kindred, shall produce equality of partition, is liable to the general remark made above, that going beyond the point before the Court, it is not to be regarded as authority. There was no question in that case, as to the proportions in which those clearly entitled to the estate', should divide it. And I think it perfectly clear, that in making the observation about equality of partition, Mr. Pendleton had no reference to the difference between a succession per capita, and a succession per stirpes; but was merely alluding to the division of estates among the many persons who are made heirs by our Law, as contrasted with the sole succession by primogeniture in England. His mind was bent upon the question, who was to be heir, and not upon the question, whether, of many persons admitted to be heirs, some should take per capita, and some per stirpes.
Judge Tucker also, in Templeman and Steptoe, I Munford, 339, uses very strong expressions as to the Act of 1785, having entirely rescinded “all former Rules and Canons of inheritance, and succession to estates, real and personal, within this Commonwealth, whether established by the Common Law, or by Statute.” But, this opinion of Judge Tucker, if it was intended to extend farther than to those Canons and Rules of inheritance, for ascertaining the persons entitled to inherit, was extra-judicial, and not authority; for, in Temple-man and Steptoe, as in Browne v. Turberviiie, the question before the Court was, as to the persons who should inherit, and not whether the heirs were to take per capita, or per stirpes.
The present is the first case in which the question has been judicially presented, whether the Common Law principle of representation, or succession per stirpes, is still to be looked to as providing for the cases not specified and provided for by the Act of 1785; or, whether that part of the Common Law has been abrogated by the Act of 1785: *And in the absence of authority, we must decide it on principle.
I have already endeavoured to prove, by the positive enactments of the Act of 1785, an intention in the Legislature to leave the Common Law, as to this principle, un-repealed. But, the subject is susceptible of another, and perhaps a stronger, aspect.
A former Law, whether Common or Statute, can be repealed or abrogated, only by express terms, or by necessary implication. It is not pretended, that the Act of 1785 abrogated the Common Law principle now under discussion, by express terms. If it has been abrogated at all, that effect has been produced by necessary implication only, on the well known principle, that leges posteriores priores contrarias abro-gant. But, the repugnance between two Laws, that is to produce that effect, must be such, that the two Laws cannot stand together. And as it is the repugnance that works the repeal, the repeal will be limited to the extent of the repugnance. Those parts of the former Law. not repugnant to the new Law, remain as much in force, as if the new Law had never been adopted. Let us apply these principles to the case *742 before us, and see how far, and how far only, they will carry us. The preference given by the Common Law, to males over females; the respect paid to primogeniture, and to the blood of the first purchaser; the exclusion of the ascending line, and of all collateral relations of the half-blood: all these parts of the Common Law are clearly repugnant to the provisions of the Act of 1785, and are admitted by all to have been consequently done away. But, the Common Law principle of representation is repugnant to no principle of the Act of 1785. On the contrary, it is recognized by that Act, and expressly applied by it to several cases therein specified. It is applied expressly to every case where “part of” any particular class of persons (provided for by previous sections of the Act,) “being dead, and a part living, the issue of those dead have right to the partition.” *It is applied to all such cases, by directing that “such issue shall take per stirpes, or by stocks; that is to say, the share of their deceased parent.” But, the Act fails, altogether, to state how the partition shall be made, when all the persons in any class shall be dead, some or all of them leaving issue entitled to the inheritance. What greater repugnance would there be in applying the Common Law principle of representation to these last cases, than there is in applying it to those cases, to which it is expressly applied by the Act, where some of the class are living, and some dead, leaving issue? The issue who come into the partition, in the cases specified in. the Act, “have right to partition,” not in their own right, nor as issue of the intestate, but as issue of the deceased persons of the given class; and they take per stirpes, or by stocks; that is to say, the share of their deceased parent. The persons who would confessedly take the estate, in the cases not specified in the Act, would “have right to partition” on the same ground, viz : as issue of their parents, and not as issue of the intestate, nor in their own right. Why then should not they also “take per stirpes, or by stocks; that is to say, the share of their deceased parents?” I am clearly of opinion, that the objection as to repugnances has no foundation, so far as relates to the principle in controversy; and that, therefore, the Common Law,, as to that principle, remains in full force, and is decisive of all the questions made in this cause.
If it be asked where then was the necessity for the fourteenth section of the Act of 1785, (the sixteenth in our present Act concerning Descents,) the answer appers to me to be obvious. The second, fourth, seventh, ninth and tenth sections of the Act of 1785, (corresponding to the same sections in the present Law,) had directed that the estate should descend to certain classes of persons, “and to their descendants.” The Legislature foresaw, that if some of the persons of a class were dead, leaving descendants, a question might arise whether, under the *broad terms of these sections, the descendants, of those persons might not claim to come into the partition per capita, with those persons of the class who were still living. And the sole object of the fourteenth section was to prevent such a question being made. It therefore declared, in substance, that when none but persons of a given class come into the partition, they shall take per capita; but, that when some of the persons of a class are dead leaving issue who have right to come into the partition with other persons of the class who are still living, that. then such issue shall not take per capita, but per stirpes, or by stocks.
I have, as yet, said nothing as to the provisions of our former Statute of Distribution, or as to the Civil Law, from which it was, in its most important features, confessedly taken. And, with due deference to my brethren, I think it necessary to say but little as to either of them. We do not know, and probably never shall know, the sources from which our Act of Descents, was drawn. It is certain, however, that so far as relates to the descending line of kindred, the same principle of representation prevailed, in infinitum, in the Civil Law, that pervails in the same line, in the Common Law. And although there is no decision on the point, yet I have no doubt that the same principle, in infinitum, prevailed, in the descending line, under our former Statute of Distributions; for that Statute was nearly an exact transcript from the British Statute, which was formed from the previous practice of the Ecclesiastical Judges in England, who made the Civil Law, a guide from which they rarely differed. To suppose, therefore, that the framers of our present Statute of Descents, intended to abolish the principle of representation in the descending line, in all cases where the claimants of the estate stood in equal degree of kindred to the intestate, would be to erect a new principle, which, so far as relates to the descending line, was unknown to the Statute of Distributions, the Ecclesiastical Courts, and to the Civil Law.
*As to the collateral line, however, neither the Statute of Distributions, nor the Civil Law, tolerated the principle of representation, except in a single case, and that was where the children of a brother, or sister of the intestate come into partition with a surviving brother or sister of the intestate. In all cases, among collat-erals, a different principle prevailed, viz:' the principle of equality of distribution. among “every of the next of kindred to the intestate, who are in equal degree;” a principle introduced into our Statute of Distributions, by an express and positive enactment. Act of 1705, ch. 7. This principle as to “the next of kindred,” is unknown to the Common Law course of descents, and also to the Act of 1785. Both at Common Law, and according to the Act of 1785, concerning descents, the principle of representation prevailed in infinitum, even among collaterals. And this is evident from the fact, that the descendants of a brother of the intestate, however far such descendants may be removed from the intestate, will be perferred to the grandfathers; and the descendants of uncles and aunts, however remote, will be preferred to the great grand-fathers. If it had been *743 intended to adopt the principle of equality of partition wherever there was equality of degree of kindred, surely those who drew our Statute of Descents, would have introduced some provision to that effect. But, it is very remarkable, that there is not in all the Act of 1785, a single expression alluding to the propinquity, equality or sameness of degree of kindred, as among those who are to inherit. The expressions “same degree,” occurs twice in that Act; once in the 10th, and once in .the 14th section. In the former, they were used merely to show what particular female ancestors were intended; and in the latter, they were used to designate the particular ancestors whose descendants were to be entitled to partition. Upon what ground, therefore, can it be supposed that our Legislature, in framing our Act of Descents, had reference either to the Civil Law, or to the Statute of Distribution! If they *had intended that the Act of Descents should conform to the Act of Distributions, it is passing strange, that instead of saying so, they should say? as they have said, that the Act of Distribution shall conform to the Act of Descents.
Upon the whole, I am of opinion, to reverse the Decree of the Chancellor, with costs, and to remand the cause, with directions that the estate of Anthony Gardner be divided into two moieties, one of which shall be assigned to the appellant, as representing her father, the brother of the intestate, and the other to be assigned to the descendants of the sister of the intestate, as representing her.
The PKBvSIDENT.
Great research has been employed, and some refinement indulged in, to come to very opposite conclusions on the question before the Court; nor is it for me to decide on the merits of a controversy which I am unable to perceive to belong to the decision to be pronounced. Our Statute of Descents, on which it must depend, appears to my understanding, to have enacted a course of descents, independent both of the. Common and Civil Law. Its having conformed either in some particulars, does not change this character of it. A revolution, on principles derogatory both to the Common and Civil Law, was to be provided for by the enactment of a course of descents, in the general, foreign to both; and when we are called upon to decide a case, not expressly noticed by the Statute, the better rule for its construction may be extracted from the principles and analogies that may be found in it, than either from the Common or Civil Law. The cardinal Canons of the Common Law of Descents are expressly abrogated by our Statute, as inconsistent with, and repugnant to, our .institutions. The jus representationis of the Common Law, which, it is said, is now to be resorted to for the purpose of expounding our Statute, followed as a consequence of those Canons of the Common Law. It was a necessary rule to *preserve the principles of those Canons. It was, as is said by Blackstone, a necessary consequence of the double preference given by the Common Law, first to the male issue, and next to the first born among the males, and he might have added, of that Canon of the Common Law, which invariably provides, that inheritances shall lineally descend to the issue of the person last actually seised in infinitum: a principle to which our Statute is more repugnant than to the opposite rule of the Civil Law, which looks for the next of kindred to the intestate, as the person entitled to take the estate in suo jure proprio, having more regard to the latter than to the former; for, though our Statute has expressly pointed to the next degree of kindred (as those who are to take the estate,) but in two provisions of it, as has been noticed, and has also disregarded the rule of the Civil Law, which prefers the next of kin among collaterals ; yet it is sufficiently evident, from other provisions, that its main scope is to regard natural affection, and, where those who are to take the estate stand in equal degree of kindred to the intestate, distributes it equally among them: nor is its adoption of the jus representationis where some of the stocks are dead, who, if alive, would take an equal share of the estate, an exception to that preference for the next of kin, which is so manifest in every part of it. In every point of view, if we are compelled to resort to the Common Law, or Civil Law, for a rule, by which to decide the case before us, the latter ought to be preferred, especially as the first would furnish no rule for the distribution of that part of the estate, which is personal, and would be more in conflict with our Statute, as to that portion of it which is real, than the Civil Law. It ought to be preferred, also, because, though the Act of Distribution refers to the Act of Descents for the rule for the distribution of personal estate, yet, as that Act conformed infinitely more to the Act of Distributions, which in most cases follows the rule of the Civil Law, than to the Common Law, to which its important provisions are utterly repugnant, the Civil *Law has higher claims to furnish a rule of construction than the Common Law. But, whatever might be my impressions on this point, derived from what I might consider a more thorough examination of the relationship of our Act of Descents to the Common or Civil Law than has been made by the Judges who preceded me, I should hesitate, at least, before I unsettled what appears to me to have been decided in the cases of Browne v. Turberville, 2 Call, and Templeman v. Steptoe, 1 Munf. by all the Judges. If these decisions are not Law, it is for the Legislature, and not for this Court to review them. It is impossible to read the opinions of the Judges in the first case, and to say that they did not deem it necessary to decide the question argued by the Bar. viz: Whether the omission of the words (in case of infants) in the 7th section of the Act of Descents, was to be supplied by the Common Law, or by a construction of the section in connection with other sections of the Act, the provisions of which would be defeated by a literal construction of that Statute, and the rule of the Common Law be let in. The question was deliberately considered by all *744 the Judges, and the President, who concurred with the other Judges, as preliminary to the decision he was about to pronounce, said “that the Act of 1.785, has totally done away the Common Law as to the course of descents, has not been and cannot-be doubted.” This cannot be said to have been an obiter opinion, for though the Court might, upon the principles of construction resorted to by it, have interpolated the words, “in case of infants,” in the 7th section, to avoid the consequence of defeating many provisions in the Act, yet it was an alternative to which it could not have been driven, if the Common Law was at hand to remedy the mischiefs which would have arisen from a literal construction of the section. All the Judges held, as may be seen in their opinions, that a recourse to the Common Law was impossible, and that the mischief could only, be remedied by the construction of the whole of the Statute, taken together, or by the Legislature.
*In the case of Templeman v. Steptoe, the question whether he supposed omission in the Statute to provide for the case before the Court, was to Qe remedied by a recurrence to the Common Law, was obviously before the Court; that the Judges so considered it, cannot be doubted, or the expressions used by them would have been entirely irrelevant. Judge Tucker said, that by the Act of 1785. all former Rules and Canons of inheritance and succession to estates real and personal, within this Commonwealth, whether established by Common Law or by Statute, were entirely rescinded, abrogated, and annulled, and that they cannot be revived in any manner, but by some express legislative provision for the purpose. So decidedly did he hold this opinion, that he preferred to leave the estate in abeyance during the life of the mother of the intestate to a resort to the Common Law. Judge Roane, to support the construction he gave to the Statute, said, “that implication may be so strong and necessary, as to be equivalent to an express declaration of the Legislature, and this the rather as the 1st section of the Act of Descents purports to provide a rule of inheritance as to all cases, which idea is entirely supported by the opinion of the Court in the case of Browne v. Turberville. ’ ’ He considered that case as a full authority to overrule even the idea that the inheritance was in abeyance in the case before the Court. Judge Fleming said, “let me premise that in my conception the Legislature intended to provide, and has provided, for every possible case that could happen, and such was *he sense of all the Judges in giving their opinions in the case of Browne v. Turberville.” How it is possible now to resort to any rule of the Common Law to provide for the case before us, without resisting the authority of these cases, I am at a loss to conjecture. If the Common Law is to be looked to in the case before us, it might with some propriety have been resorted to in these cases. If so much of it only is abrogated by our Statute, as expressly provides for cases that have occurred, or may occur, then *indeed, all the Judges who have gone before us, were in profound error. That their opinions were mere dicta on points not before them, cannot be insisted on, if the cases are well examined.
Nor will the distinction which is taken between the persons who are to take the inheritance, and the amount of the portion to which they are entitled, obviate the force of these decisions, or weaken the reasons on which they are founded. If you are not to look to the Common Law for the persons who are to take the inheritance, because it is abrogated by the Statute, you cannot look to it for the portions of the inheritance to which they are entitled, for the same reason. The Statute would be truly imperfect, if it has not provided for both. If the Common Law is to be resorted to for the latter, and thereby to fix the amount of the portion, the principle is to be let in, that the lineal descendants, in infinitum, of any person deceased, shall represent their ancestor. The character of the Statute would be essentially changed, its regard to natural affection, ard preference for the next of kin to the intestate, would be overruled by the Common Law, to which its essential provisions are repugnant. That the eighteenth section ox our Act, which declares that it shall be no bar to a party, that any ancestor, through whom he derives his descent from the intestate, is, or hath been an alien, is a recognition of the existence of the Common Law of Descents, I think, is equally unfounded. .The Common Law in regard to aliens, was no part of the Common Law of Descents. It was founded on an entirely different policy, a policy repugnant to the spirit of our institutions, and to our Act of Descents, which regards natural affection, wherever the object of it may be, and was required to be abrogated by our Statute, as being in conflict with its spirit and principles. In every point of view, both upon reason and authority, I think the Common Law of Descents has been abrogated by our Statute, and that it cannot be resorted to, to supply any supposed defects in it. But, if it were not, *1 think it will be found, on an examination of the Statute, that there will be as little difficulty in finding a provision for the case before us, by a sound construction of it, as in the cases referred to. Its first section professes to provide a course of descents in ail cases to arise in future. It enacts, that henceforth, when any person having title to any real estate of inheritance, shall die intestate as to such estate, it shall descend, and pass in parcenary to his kindred, male and female, in the following course. &c. The fourth section, explained by the sixteenth section, provides for the case before us. Anthony Gardner, whose estate is to be distributed, died intestate, leaving neither children, nor their descendants, nor father, nor mother, nor brother, nor sister, but leaving descendants of a brother and sister. The fourth section declares, that if there be no lather, (to whom the third section gives the estate, where there are no children, or their descendants,) then to his mother, brothers and sisters, and their descendants, or such of *745 them as these be. The descendants of the brother and sister of Anthony Gardner, at the time of his death, were, one niece on the part of his brother, two nephews on the part of his sister, and the children of two deceased nieces on the part of the sister. These are called to the inheritance by the fourth section, it must be admitted. A due regard is paid by it to natural affection ; for they, the niece and nephews, were the next of kin to Anthony Gardner, at the time of his death, and next to them, the children of his two nieces, who have died. Standing on the fourth section alone, it might be insisted, (on a literal construction of it,) that, as the children of the deceased nieces were descendants of the sister of the intestate, they would be entitled to an equal portion of the inheritance with the living niece, and nephews, though they are not in the same degree of kindred with them to the intestate. In such case, the preference for the next of kin would be lost sight of: but, giving due weight to that preference, it might be plausibly insisted on, that, though they are descendants *of the sister of the intestate, they are by one degree not so near of kin to the intestate as his niece and two nephews, and though entitled to take a portion of the inheritance by the words of the fourth section, are entitled only to the shares of their mothers, who were in the same degree of kindred to the intestate, with the living niece and nephews, not jure representationis, but in suo proprio jure, by force of the principle alluded to. But, the sixteenth section, I think, clears up this difficulty. Taking it in reference to the four first sections of the Act, and it impliedly provides for the case before us. The first section, as was said by Judge Tucker, in the case of Templeman v. Steptoe, professes to provide for every case. The words of it are: “Be it enacted by tne General Assembly, That henceforth, where any person having title to any real estate of inheritance shall die intestate as to such estate, it shail descend and pass in parcenary to his kindred, male and female, in the following course,” &c. The second section gives the estate to his children, or their descendants, if any there be: the third section, if there be no children nor their descendants, gives it to the father: the fourth section, if there be no father, then to his mother, brothers, and sisters, and their descendants, or such of them as there be. All these sections follow the current of natural affection, and strongly indicate the preference for the next of kin to the intestate. The sixteenth section fixes the portion of all, by specific examples, which contain the principle to be applied. It begins with the copulative. ■“And where the children of the intestate,” (the first class; plainly referring to the second section, in which provision is made for children,) “or his mother, brothers, and sisters,” (the second class; provided for in the fourth section, passing the third, in which the father is provided for) “or his grand-mother, uncles and aunts,” (third class,) &c. come into the partition, they shall take per capita; that is to say, by persons, and where a part of them being dead, and a part living, *the issue of those dead having right to partition, such issue shall take per stirpes, or by stocks; that is to say, the shares of their deceased parents. If, then, in the case before ns, either the brother or sister of Anthony Gardner had been alive at his death, and the other dead, leaving children, it is clear, the children would have taken the share of their deceased parent, equally to be divided among them; because, according to common intent, which is common sense, where an estate devolves on more persons than one, and the portions are not designated, they take equal shares, as is said by Mr. Pendleton in Browne v. Turberville, not by the Common Daw, the jure representationis, but by force of the Statute in jure suo proprio. In ail of the examples put by this section, whenever one of the stocks of the nearest kindred is alive, and some dead, the descendants of those dead take per stirpes, that is, the shares. of their parents by force of the Statute, and not jure representationis by the Common Law ; for, if they did, in the cases of remote kindred, if you mount up to the stock by that principle of the Common Law, you defeat the preference for the next of kin, which is to be found in the Statute: as in the case before us, if you look to the brother and sister of the intestate (where both were dead at the time of his death) and consider them as alive, you would defeat the principle of preference for the next of kin, by dividing the inheritance equally among their descendants where some of them are one degree more remote than the others, by giving one-half of the inheritance to the Appellant, the niece of the intestate, to the injury of the two nephews, in equal degree of kindred to the intestate, and that for the purpose of giving larger portions to the children of the dead nieces (who are one degree more remote) than they would otherwise be entitled to. If in the cases expressly provided for by the sixteenth section, as where some of the children of the intestate are dead, and some living, or where some of his brothers and sisters are dead, and some living, the children of those dead are to take ''‘per stirpes, the shares of the deceased parents, why should not the children of deceased nieces, in the case before us, be confined to the shares of their deceased parents according to the principle applicable to children, and brothers and sisters when some are alive, and some dead, leaving children? No possible reason can he assigned for it, but that they are not expressly provided ior in the sixteenth section. But this was unnecessary, if it were possible to provide for every case. It was enough, that while the Statute professes to provide for every case in its first section, it furnishes a principle applicable to all which are not expressly provided for. When all of a class are alive,- they take per capita, by persons; and when some are alive, and some dead, leaving children, the latter take per stirpes, the shares of their deceased parents: in relation to each other, they take equal shares, being in equal degree of kindred to the intestate; but, in Relation to those of the *746 class who are alive, and stand in one degree of kindred nearer to the'intestate, they take unequal share, where the deceased parent leaves more than one child, as in the case before us, the niece and nephew alive at the death of the intestate, and standing in equal degree of kindred to him, take equal shares of the inheritance, and the children of the deceased nieces, representing their dead parents, take their shares equally among them per stirpes, but standing in one degree more remote from the intestate, take unequal shares in relation to the shares of the living niece (the Appellant) and of the two nephews.
This construction of the Statute is not so violent as in the cases cited. If in any of the cases not expressly provided for by the Statute, we can get a principle applicable to the cases expressly provided for, we are at liberty to apply it to cases not expressly provided for.
On this construction of the Statute, I think the Decree is correct, and ought to be affirmed.

 Co. Litt. and Black. Com. Collingwood v. Pace, 1 Lev. 59, in the Exchequer Chamber, 13th and 14th Car. 2, in which it was held by seven Judges against three, that the alienage or attainder of the common ancestor before the birth of his children, would not impede a descent between them, a conclusion ever since adhered to, contrary to the opinion of Lord Coke, in Co. Litt. 8, a. — Note in Original Edition.

 By Doctor Lane, in Blackborough v. Davis, 1 P. Wms. 48, father preferred to mother. Per Holt, Ibid.: Coplestone v. Coplestone, 2 Show. 307. — Note in Original Edition.

 Vulteus, (or Vultijus) 375. If a child died without descendants, the father took his estate, (if he had not been emancipated,) jure patriaspotestatis: if he was emancipated, contracta fiducia, the father succeeded ut agnatus; and if emancipated without such stipulation, the father was preferred by the Prmtorian Edict “unde decernso that he was, in all events, preferred to all other ascendants and collaterals. — Note in Original Edition.

 Blackborough v. Davis, 1 P. Wms. 48. by Lord Hakdwxoke.

 Moor v. Barham, 1 P. Wms. 53: (Brand-father on the father’s side, and srand-motiier on the mother's side, take equally together. — Note in Original Kdition.

 By Sir Joseph Jekyli,, Master of the Rolls, in Mentney v. Petty, cited 1 P. Wms. 27.

 Domat. 649: Vulteius. (or Vultijus,) 378, 879.

 Cooper’s Justinian, 394.

 Pett’s Case, 1 P. Wms. 25; Bowers v. Littlewood, 1 P. Wms. 594.

 Poole v. Wilshaw, (1708;) Norbury v. Vicars, (1749;) Evelin v. Evelin, (1754;) cited in Cooper’s Justinian, 897.

 Thomas v. Ketteriche, 1 Ves. sen. 333. where Lord Hardwtcke takes notice of Wilshaw’s Case; Durant v. Prestwood, 1 Atk. 454; Stanley v. Stanley, 1 Atk. 457; Pett v. Pett, 1 Salk. 250.

 1 Ventris. 316.

 Lloyd v. Tench, 2 Ves. sen. 213.

 Walsh v. Walsh, Eq. Ca. Abr. 249; Davers v. Dewes, 3 P. Wms. 50.

 Northev v Strange, 1 P. Wms. 313; Davenport v. Hanbury, 8 Ves. 257; Butler v. Stratton, 3 Bro. C. C. 367.

 1 Domat, 562.

 Per Lord Holt, in Blackborougrh v. Davis, 1 P. Wms. 50.

 Oct. 1789, ell. 30 sec. 13, and 13 Hen. St. L. 40.

In Proud v. Turner, 2 P. Wms. 560. The issue of a child advanced, held to be bound to bring' the advancement into hotchpot.

 Coke Litt 11. b. If a man has issue, a son and a daughter, and the son purchase lands, and dies without issue, the daughter shall inherit the land: hut, If the father has issue afterwards, (no matter how long after.) a son. this son shall enter into the land, as heir of hts brother, and if he has issue, a 'daughter, and no son, she shall be a co-parcener with her sister.
Without consideringthe Common Law, in force in this respect, this could not have happened under our Statute which only designates brothers and sisters, and their descendants, or such of them as there be at the death of the intestate. — Note in Original Edition.

 Co. Litt. 166. b.